

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| El Pueblo de Puerto Rico | Certiorari |
|---|---|
| Peticionario | |
| v. | 2011 TSPR 38 |
| José Miguel Flores Flores | 181 DPR _____ |
| Recurrido | |

Número del Caso: CC - 2007 - 148

Fecha: 23 de marzo de 2011

Tribunal de Apelaciones:

Panel X Región Judicial de Caguas

Juez Ponente:

Hon. Carmen A. Pesante Martínez

Oficina del Procurador General:

Lcda. Luana R. Ramos Carrión
Procuradora General Auxiliar

Lcda. Zulema E. Martínez Alvarez
Procuradora General Auxiliar

Abogado de la Parte Recurrida:

Lcdo. José Luis Rivera Fernández

Materia: Violencia Doméstica

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico
    Peticionario


     v.                  CC-2007-148      *Certiorari*

José Miguel Flores Flores
    Recurrido


*SENTENCIA*

En San Juan, Puerto Rico, a 23 de marzo de 2011.

El 14 de mayo de 2006, el Ministerio Público presentó una denuncia contra José Miguel Flores Flores, en la cual le imputó la comisión del delito de maltrato tipificado en el artículo 3.1 de la Ley 54 de 15 de agosto de 1989, Ley para la Prevención e Intervención con la Violencia Doméstica.[1] La denuncia explica que ese día el señor Flores Flores cruzó su vehículo frente al automóvil de la señora Carmen Romero Pérez, le quitó las llaves, se montó en el auto y comenzó a discutir con ella y a golpearla. Cuando la señora Romero Pérez intentó

---

[1] 8 L.P.R.A. sec. 631.

salir del vehículo, el acusado la sujetó fuertemente por el brazo, la haló y agarró por el pelo y le apretó fuertemente el cuello, causándole marcas.

El expediente indica que el acusado mantuvo con la víctima una relación afectiva que incluyó relaciones sexuales durante aproximadamente diez meses. Sin embargo, nunca cohabitaron y la señora Romero Pérez estaba casada con otro hombre.

El mismo día en que se presentó la denuncia, se determinó causa probable para el arresto y se fijó fianza. Poco tiempo después, se celebró la vista preliminar, en la cual el Tribunal de Primera Instancia determinó causa para acusar por el delito imputado. El 12 de junio de 2006, se llevó a cabo el acto de lectura de acusación, luego de lo cual el señor Flores Flores solicitó la desestimación del caso al amparo de la Regla 64(p) de Procedimiento Criminal.[1] Adujo que la determinación de causa probable no se hizo conforme a la ley y al derecho, y que se violó su derecho al debido proceso de ley. Más concretamente, expresó que hubo ausencia total de prueba que demostrara la comisión del delito imputado, porque su relación con la supuesta perjudicada era una de "novios" pero ella estaba casada con otro hombre. Según el acusado, este tipo de relación adúltera no está contemplada en la Ley 54 y, por ende, no se probaron los elementos del delito de maltrato tipificado en dicho estatuto. El 26 de junio de 2006, el señor Flores

---

[1] 34 L.P.R.A. Ap. II, R. 64(p).

Flores presentó una moción para solicitar que el Ministerio Público descubriera la prueba en su contra, amparado en la Regla 95 de Procedimiento Criminal.[2]

El 7 de julio de 2006, el Gobierno se opuso a la desestimación de la acusación al entender que en la vista preliminar se había presentado prueba suficiente para sostener una determinación de causa probable para acusar por el delito imputado. Expuso que la relación sostenida por el acusado y la perjudicada está contemplada en la definición del concepto relación de pareja contenida en el artículo 1.3 de la Ley 54, la cual incluye a aquellas personas que sostienen o han sostenido una relación consensual íntima.[3] Además, el Ministerio Público objetó las expresiones de la defensa en cuanto al estado civil de la perjudicada, argumentando que el derecho vigente nada dispone respecto al estado civil del acusado o la perjudicada en casos presentados al amparo de la Ley 54. Por último, el Ministerio Público contestó el descubrimiento de prueba de la defensa y solicitó el descubrimiento recíproco al amparo de la Regla 95A de Procedimiento Criminal.[4]

El tribunal celebró vista para determinar si procedía la desestimación de la acusación, tras lo cual decidió que no había ausencia total de prueba y ordenó que se continuaran los procedimientos.

---

[2] 34 L.P.R.A. Ap. II, R. 95.

[3] 8 L.P.R.A. sec. 602.

[4] 34 L.P.R.A. Ap. II, R. 95A.

Habiéndose denegado una petición de reconsideración, el acusado recurrió al Tribunal de Apelaciones mediante petición de certiorari. En ésta, reprodujo los argumentos planteados en su petición de desestimación y solicitó que se paralizaran los procedimientos, en auxilio de jurisdicción. Así lo hizo el Tribunal de Apelaciones y le ordenó al Procurador General mostrar causa por la cual no debía revocar la resolución recurrida y desestimar la acusación.

El 13 de octubre de 2006, el Procurador General se opuso a la expedición del recurso. Planteó que entre el acusado y la perjudicada hubo una relación consensual íntima, independientemente de que ésta estuviese casada con otra persona, y que una relación de este tipo estaba incluida en el concepto de relación de pareja que sirve de base para la aplicación de la Ley 54. Por ende, indicó, el acto de violencia que se le imputaba al acusado tenía que juzgarse según la ley especial y no dentro de la estructura penal tradicional.

El foro intermedio apelativo expidió el recurso y revocó la determinación del tribunal de instancia. Concluyó que, aunque el estatuto contiene un lenguaje amplio para proteger una serie de relaciones que trascienden el vínculo conyugal, la relación adúltera que hubo entre la alegada víctima y el acusado no está comprendida en el concepto de relación consensual de la Ley.[5]

---

[5] Sentencia del Tribunal de Apelaciones de 5 de diciembre de 2006, caso KLCE 06 1118 (Panel integrado por las juezas

Inconforme, el Procurador General recurrió ante este Tribunal. En su recurso de certiorari, señaló que el foro intermedio erró al resolver que la Ley 54 no aplica a los actos de maltrato que se suscitan en el seno de una pareja consensual si uno de sus miembros está casado con otra persona. Expedimos el auto y ambas partes presentaron sus alegatos.

Por estar igualmente dividido el Tribunal, se dicta Sentencia confirmatoria de la Sentencia emitida por el Tribunal de Apelaciones en este caso.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal. El Juez Asociado señor Kolthoff Caraballo emitió una Opinión de conformidad, a la cual se unen el Juez Asociado señor Martínez Torres y la Jueza Asociada señora Pabón Charneco. La Jueza Asociada señora Fiol Matta emitió una Opinión disidente, a la cual se unen el Juez Presidente señor Hernández Denton y la Juez Asociada señora Rodríguez Rodríguez. El Juez Asociado señor Rivera García emitió un Voto de inhibición.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

Pesante Martínez y Hernández Torres y el juez Escribano Medina).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

    v.                      CC-2007-148      Certiorari

José Miguel Flores Flores

    Recurrido

Opinión de Conformidad emitida por el Juez Asociado señor Kolthoff Caraballo a la cual se unen el Juez Asociado señor Martínez Torres y la Jueza Asociada señora Pabón Charneco

San Juan, Puerto Rico a, 23 de marzo de 2011.

Estoy conforme con la Sentencia emitida en el día de hoy, en tanto confirma el dictamen del Tribunal de Apelaciones, Región Judicial de Caguas. Este dictamen sostuvo que el Art. 3.1 de la Ley para la Prevención e Intervención con la Violencia Doméstica (Ley 54) no es de aplicación a un incidente de violencia dentro de una relación adulterina.

Al expresar mi conformidad pesa en mi ánimo no sólo el estar convencido que la sentencia del Tribunal de Apelaciones se ajusta a los principios del Derecho Penal puertorriqueño, sino, además, que la mujer víctima de esta alegada agresión no

quedará desprovista de protección. Como detallamos más adelante, la víctima cuenta con remedios análogos para proteger su vida e integridad, y hacerle finalmente justicia. Como señalamos en Pueblo v. Ruiz, infra:

> La persona agredida no queda desprovista de protección aunque no aplique la Ley Num. 54, supra, no solamente por que la conducta imputada puede constituir un delito bajo el Código Penal, sino porque también podrían aplicar los Arts. 4 y 5 de la Ley Num. 284 de 21 de agosto de 1999 (33 L.P.R.A. secs. 4014 y 4015),[Ley contra el Acecho en Puerto Rico] que establecen un mecanismo de órdenes protectoras contra toda persona que intencionalmente manifieste un patrón de conducta persistente de acecho dirigido a intimidar a otra persona.

Repasemos brevemente los hechos que originan la controversia.

I

Contra el Sr. José Miguel Flores Flores (en adelante acusado) se presentó una denuncia por infracción al Art. 3.1 de la Ley para la Prevención e Intervención con la Violencia Doméstica (Ley 54). A éste se le imputó haber empleado maltrato físico contra la Sra. Carmen M. Romero Pérez (perjudicada), persona con la cual, alegadamente, cohabitaba y sostenía una relación consensual.

Así, se celebró una oportuna vista preliminar en la que se determinó causa probable para acusar, por lo que se presentó la acusación correspondiente. Posteriormente, el acusado presentó una moción al amparo de la Regla 64(p) de

Procedimiento Criminal en la que alegó la ausencia total de prueba respecto al delito que se le imputó debido a que la relación que sostenía o sostuvo con la perjudicada no estaba contemplada por la Ley 54. Ello, porque los actos imputados se produjeron dentro de una relación adulterina. El Ministerio Público se opuso a lo solicitado y sostuvo que la relación entre el acusado y la perjudicada era la de una pareja y en la que incluso se sostuvieron relaciones sexuales. Además, alegó que el Derecho vigente no exigía algún requisito en cuanto al estado civil del acusado o de la perjudicada para la aplicación del artículo en cuestión.

Tras realizar el examen de rigor, el Tribunal de Primera Instancia determinó que no existía tal ausencia total de prueba, por lo cual, declaró no ha lugar la moción de desestimación. Luego de la denegatoria de las solicitudes de reconsideración, el acusado acudió al Tribunal de Apelaciones, el cual revocó. El foro apelativo intermedio sostuvo, conforme al historial legislativo de la Ley 54 y al principio de legalidad, que en el presente caso no se configuraron todos los elementos del delito imputado. En vista de ello, el Tribunal de Apelaciones desestimó la acusación. De esta decisión recurre el Procurador General.

Veamos la normativa aplicable a la controversia que hoy atendemos.

**II**

**A**

De entrada, debemos estar conscientes que la Ley 54 es un estatuto con disposiciones de carácter penal. Por consiguiente, al ejercer nuestra función de interpretar dicho estatuto, no debemos perder de perspectiva los principios generales del Derecho Penal que limitan tal función. Entre estos se encuentra el principio de legalidad.

El principio de legalidad es una exigencia de seguridad jurídica que requiere el conocimiento previo de los delitos y sus penas, además es una garantía política que protege al ciudadano de verse sometido por parte del Estado a penas que no admita el Pueblo.[6] El propósito principal de este principio es limitar las aplicaciones arbitrarias y caprichosas de los estatutos penales.[7] Asimismo, el principio de legalidad salvaguarda la separación de poderes al reconocerle sólo a la Asamblea Legislativa la legitimidad para criminalizar una conducta.[8] De igual forma, se entiende que este principio fomenta la prevención general y fundamenta el principio de culpabilidad.[9] Lo anterior se sustenta en que no puede

---

[6] S. Mir Puig, Derecho Penal: Parte General, 8va ed., Barcelona, Ed. Reppertor, 2008, pág. 106.

[7] L.E. Chiesa Aponte, Derecho Penal Sustantivo, San Juan, Ed. Publicaciones JTS, 2007, pág. 43.

[8] Íd.

[9] Íd.

hablarse de culpabilidad ni de motivar a una persona a actuar conforme a Derecho si la conducta no estaba prohibida al momento de los hechos.[10]

En Puerto Rico, el principio de legalidad está recogido específicamente en el Art. 2 del Código Penal, el cual dispone que:

> No se instará acción penal contra persona alguna por un hecho que no esté expresamente definido como delito, ni se impondrán penas o medidas de seguridad que la ley no hubiere previamente establecido.[11]

De esta forma, se prohíbe instar una acción penal por un hecho que no está expresamente definido como delito, así como imponer penas o medidas de seguridad que no estén establecidas por la ley con anterioridad a los hechos. Con ello, se pretende que la Asamblea Legislativa sea la que defina lo que constituye una conducta delictiva y sus respectivas penas.[12] Así, se elimina la posibilidad de crear delitos a través de la jurisprudencia o el Derecho consuetudinario.[13] Es principio reiterado que los tribunales no tienen la autoridad "para considerar como constitutivos de delito hechos distintos a los consignados en la ley, ni imponer sanciones no previstas en la misma".[14] (Énfasis suprimido).

---

[10] Íd.

[11] 33 L.P.R.A. sec. 4630.

[12] Chiesa Aponte, op. cit., pág. 44.

[13] Íd.

[14] Pueblo v. Figueroa Garriga, 140 D.P.R. 225, 231 (1996).

Por su parte, se ha establecido claramente que, conforme al principio de legalidad, lo importante es que una persona común y corriente, que carezca de conocimientos legales, pueda comprender razonablemente lo que se prohíbe.[15] "No se satisface el fundamental principio de legalidad, si para conocer lo que está vedado es necesario un esfuerzo hermenéutico propio de juristas".[16]

Cónsono con lo anterior, el Art. 3 del Código Penal establece la prohibición de crear delitos o imponer penas o medidas de seguridad por analogía.[17] Conforme a esta prohibición, "el juez está impedido de penalizar por un hecho no tipificado como delito por su semejanza con uno tipificado como tal; o admitir un agravante o una gradación específica no enumerada, basándose en sus semejanzas con una enumerada; o imponer una pena no contemplada por la ley por su analogía con una prevista en la ley".[18] En este contexto, al analizar la prohibición de analogía, en Pueblo v. Bonilla, 148 D.P.R. 486, 503 (1999), expresamos que:

> La analogía conlleva aplicar la ley a unos hechos o situaciones no considerados en determinada ley, porque son semejantes o parecidos a los allí dispuestos. Al aplicar la analogía, el juez suple la voluntad del

---

[15] Pueblo v. Martínez Yanzanis, 142 D.P.R. 871, 877 (1997).

[16] Íd.

[17] 33 L.P.R.A. sec. 4631.

[18] D. Nevares Muñiz, Derecho Penal Puertorriqueño: Parte General, 6ta ed., San Juan, Ed. Instituto para el Desarrollo del Derecho, 2010, pág. 76.

legislador, la cual no existe para los hechos que tiene ante sí, basado en su semejanza a los hechos sí tipificados.

Como toda ley, las leyes penales están sujetas a interpretación. Sin embargo, la diferencia entre la interpretación (permitida si es razonable) y la analogía (prohibida en lo que perjudica al acusado) estriba en lo siguiente: la interpretación busca un sentido en el texto de la ley que se enmarque en su "sentido literal posible" y la analogía supone la aplicación de la ley penal a un supuesto que no está comprendido en ninguno de los sentidos posibles de su letra, pero análogo a otros en el texto legal.[19]

Ahora bien, uno de los fundamentos principales de la hermenéutica legal es que siempre "debe describirse y hacerse cumplir la verdadera intención y deseo del poder legislativo".[20] Incluso, en ocasiones debemos suplir las posibles deficiencias presentes en las leyes, a través de una interpretación en la que analicemos la ley como un ente armónico y lógico.[21] Sin embargo, en el campo penal el proceso de hermenéutica legal es limitado. La interpretación de los estatutos penales debe ser restrictiva en lo que desfavorece al acusado y liberal en lo que le favorece.[22]

---

[19] Mir Puig, op. cit., pág. 115.

[20] Pueblo v. Zayas Rodríguez, 147 D.P.R. 530, 549 (1999).

[21] Sucn. Álvarez v. Srio. Justicia, 150 D.P.R. 252 (2000).

[22] Pueblo v. Barreto Rohena, 149 D.P.R. 718, 722 (1999).

Por ello, cuando existen dudas en torno al alcance o sentido de una disposición penal, los tribunales debemos aclarar dicho sentido o alcance. Lo anterior no significa que podemos darle a una ley un significado más limitado al que usualmente tiene dentro de la realidad social.[23] No obstante, tampoco significa que debemos ignorar la clara intención legislativa.[24] "[N]inguna regla de interpretación –ni siquiera la de interpretación restrictiva de los estatutos penales- debe derrotar el propósito que la legislación persigue".[25] Así, la interpretación restrictiva aplicable a los estatutos penales se hará sin menoscabo de la intención legislativa conocida o evidente.[26]

En ese ejercicio de interpretación, y cónsono con lo antes expuesto, cabe señalar lo que dispone el Art. 13 del Código Penal sobre esta materia:

> Las palabras y frases se interpretarán según el contexto y el significado sancionado por el uso común y corriente. …Si el lenguaje empleado es susceptible de dos o más interpretaciones, debe ser interpretado para adelantar los propósitos de este Código y del artículo particular objeto de interpretación.

Claramente, el precepto anterior requiere que las disposiciones del Código Penal se interpreten conforme a la voluntad del legislador. De igual forma, al examinar

---

[23] Pueblo v. Figueroa Pomales, 172 D.P.R. 403, 417 (2007)

[24] Íd.; Pueblo v. Sierra Rodríguez, 137 D.P.R. 903 (1995); Pueblo v. Arandes de Celis, 120 D.P.R. 530 (1988); Pacheco v. Vargas, 120 D.P.R. 404 (1988).

[25] Pueblo v. Figueroa Pomales, supra.

[26] Íd.; Pueblo v. De León Martínez, 132 D.P.R. 746, 750-751 (1993).

los estatutos penales en el ejercicio de nuestra función de interpretar las leyes, debemos considerar la realidad social de donde surgen y operan.[27] Sin embargo, tal y como expresa el profesor L.E. Chiesa Aponte, "cuando de interpretar textos jurídicos se trata, los límites no están principalmente dictados por el sentido ordinario del lenguaje, sino por la comunidad interpretativa a la cual pertenece el juzgador".[28] Por consiguiente, "las interpretaciones de las leyes penales son válidas siempre y cuando sean previsibles a la luz de la normativa vigente previo a realizarse la interpretación".[29]

**B**

La violencia doméstica es uno de los problemas más graves y complicados que enfrenta nuestra sociedad. Aunque generalmente se le utiliza en referencia a la violencia contra la mujer, este concepto es más amplio. Se entiende que la violencia doméstica incluye los actos de violencia intrafamiliar, siendo los niños y las mujeres los más afectados.[30] Por lo que en términos generales, el concepto se refiere a la "violencia entre personas que participan

---

[27] Pueblo v. Figueroa Pomales, *supra*, págs. 416-417 (2007); Pueblo v. Sierra Rodríguez, *supra*; Pueblo v. Arandes de Celis, *supra*; Pacheco v. Vargas, *supra*.

[28] Chiesa Aponte, op. cit., pág. 47.

[29] Íd.

[30] E.B. Marín de Espinosa Ceballos, La Violencia Doméstica, Análisis Sociológico, Dogmático y de Derecho Comparado, Granada, Ed. Comares, 2001, págs. 1-3.

del mismo núcleo familiar y, en la mayor parte de los casos, comparten una misma unidad de vivienda".[31]

En Puerto Rico, luego de largas luchas y múltiples esfuerzos, la Asamblea Legislativa aprobó la ley que busca prevenir e intervenir con la violencia doméstica. Por consiguiente, la Ley Núm. 54 de 15 de agosto de 1989, conocida como Ley para la Prevención e Intervención con la Violencia Doméstica (Ley 54) es el estatuto que refleja la política pública del Gobierno en torno a este grave problema. En esencia, la Ley 54 estableció un sistema más ágil y sencillo para la protección de las víctimas a través de la expedición de órdenes de protección. También incorporó elementos de auto-ayuda que procuran estimular a las víctimas de violencia doméstica a solicitar remedios legales provisionales e inmediatos por sí mismas. Además, la Ley tipifica el delito de maltrato en diversas modalidades y sus respectivas penalidades, las cuales son mayores en caso de reincidencia y ante circunstancias agravantes. Asimismo, establece medidas para la intervención de la policía, como el arresto mandatorio, la responsabilidad de proveer asistencia a la víctima y de recopilar información sobre la violencia doméstica. Todas estas medidas tienen el propósito de "atender las áreas fundamentales que requieren solución inmediata para ejecutar la política pública de combatir la criminalidad y

---

[31] R.E. Ortega-Vélez, Sobre… Violencia Doméstica, 2da ed., San Juan, Ed. Scisco, 2005, pág. 1.

brindar alternativas de esperanza a la familia puertorriqueña".[32]

No obstante, en el contexto particular de la Ley 54 la violencia doméstica es definida como:

> …un patrón de conducta constante de empleo de fuerza física o violencia psicológica, intimidación o persecución contra una persona por parte de su cónyuge, ex cónyuge, una persona con quien cohabita o haya cohabitado, con quien sostiene o haya sostenido una relación consensual o una persona con quien se haya procreado una hija o un hijo, para causarle daño físico a su persona, sus bienes o a la persona de otro o para causarle grave daño emocional.[33]

Es decir, contrario al concepto amplio de la violencia doméstica, nuestra legislación se limitó a la violencia en el ámbito conyugal o entre parejas o ex parejas. En consecuencia, para poder comprender con claridad los alcances de esta ley en las diversas relaciones de pareja que abarca, es necesario referirnos no sólo a sus disposiciones, sino también a la intención legislativa. Por tal razón, para resolver la controversia ante esta Curia es necesario interpretar la Ley 54 y por ende, es preciso comprender la política pública que le subyace.

Precisamente, el Art. 1.2 de la Ley expone esa política pública, de la forma siguiente:

> El Gobierno de Puerto Rico reconoce que la violencia doméstica es uno de los problemas más graves y complejos que confronta nuestra

---

[32] Exposición de Motivos, Ley Núm. 54 de 15 de agosto de 1989.

[33] 8 L.P.R.A. sec. 602.

sociedad. En el desarrollo de la política sobre este asunto, debemos dar énfasis a atender las dificultades que las situaciones de violencia doméstica presentan, particularmente a mujeres y menores, para preservar su integridad física y emocional, procurar su seguridad y salvar sus vidas.

La violencia doméstica es una de las manifestaciones más críticas de los efectos de la inequidad en las relaciones entre hombres y mujeres. Las ideas, actitudes y conductas discriminatorias también permean las instituciones sociales llamadas a resolver y a prevenir el problema de la violencia doméstica y sus consecuencias. Los esfuerzos de estas instituciones hacia la identificación, comprensión y atención del mismo han sido limitados y en ocasiones inadecuados.

El Gobierno de Puerto Rico se reafirma en su compromiso constitucional de proteger la vida, la seguridad y la dignidad de hombres y mujeres. Además, reconoce que la violencia doméstica atenta contra la integridad misma de la familia y de sus miembros y constituye una seria amenaza a la estabilidad y a la preservación de la convivencia civilizada de nuestro pueblo.

Como política pública, el Gobierno de Puerto Rico repudia enérgicamente la violencia doméstica por ser contraria a los valores de paz, dignidad y respeto que este pueblo quiere mantener para los individuos, las familias y la comunidad en general. A través de esta política pública se propicia el desarrollo, establecimiento y fortalecimiento de remedios eficaces para ofrecer protección y ayuda a las víctimas, alternativas para la rehabilitación de los ofensores y estrategias para la prevención de la violencia doméstica.

Claramente, la política pública expuesta presta especial atención a la violencia contra las mujeres, ya que éstas son las que más han sufrido los embates de la desigualdad social, las relaciones de poder y el resquebrajo de un hogar seguro. Sin embargo, aunque la

violencia doméstica afecta principalmente a las mujeres, la legislación fue finalmente aprobada con un lenguaje neutral. Es decir, la política pública del Estado está dirigida a preservar la integridad física y emocional de la mujer y el hombre en sus relaciones de pareja.[34] Así, al examinar la política pública expuesta en la Ley 54 es evidente que ésta se fundamenta en el sentido máximo de proteger la vida, la seguridad y la dignidad de los hombres y las mujeres.

Ahora bien, esa política pública también resalta la importancia que tiene el núcleo familiar en la legislación contra la violencia doméstica. En ésta se reconoció que dicha violencia "atenta contra la integridad misma de la familia".[35] Además, se reconoció expresamente que como política pública, "el Gobierno de Puerto Rico repudia enérgicamente la violencia doméstica por ser contraria a los valores de paz, dignidad y respeto que este pueblo quiere mantener para los individuos, las familias y la comunidad en general".[36]

El historial legislativo de la Ley 54 refleja que el interés principal del Estado fue la tipificación del delito de maltrato conyugal, aunque finalmente este estatuto terminó aprobándose con un lenguaje que protege

---

[34] Véase, Pueblo v. Figueroa Santana, 154 D.P.R. 717, 723-724 (2001).

[35] 8 L.P.R.A. sec. 601.

[36] Íd.

varios tipos de relaciones.[37] No obstante, de dicho historial surge el claro deseo legislativo de proteger la integridad misma de la familia y sus miembros. Por ejemplo, se señaló que la violencia doméstica constituye un serio problema para la familia puertorriqueña ya que "[s]e trata de violencia entre personas que participan del núcleo familiar y comparten la unidad de vivienda".[38] Lo anterior es cónsono con las expresiones vertidas por la entonces Directora Ejecutiva de la Comisión para los Asuntos de la Mujer, Oficina del Gobernador, en su informe ante las comisiones legislativas que estudiaron dicha legislación. En ese informe se expresó que:

> Más allá de los efectos que el maltrato pueda tener directamente sobre la víctima, todos los estudios consultados indican que tiene efectos sumamente detrimentales sobre los niños y niñas y sobre la familia en general. Los niños y niñas que viven en hogares violentos aprenden la conducta violenta como aprenden cualquier otro tipo de comportamiento. Reciben el mensaje de que la violencia es un mecanismo normal para resolver conflictos y para tratar a las demás personas.[39]

Además, al citar con aprobación un informe del Procurador de Estados Unidos se señaló que "[l]a familia es la unidad fundamental sobre la que se construye la

---

[37] Véase, Informe Conjunto de las Comisiones de lo Jurídico, de Desarrollo Cultural y Seguridad Social y de Asuntos de la Mujer en torno al Sustitutivo a los Proyectos del Senado 90 y 470 de 25 de junio de 1989.

[38] Íd., pág. 4.

[39] Informe de la Comisión para los Asuntos de la Mujer ante las Comisiones de lo Jurídico, de Desarrollo Cultural y Seguridad Social y de la Mujer del Senado sobre el Proyecto del Senado 470, de 1 de junio de 1989, pág. 10.

sociedad".[40] Así, pues, el legislador tomó como referencia no sólo la violencia intrafamiliar y el maltrato conyugal, sino los efectos y las consecuencias de dicha violencia en el seno familiar.[41]

Por tal razón, al aprobar la Ley 54, nuestra Asamblea Legislativa expresó diáfanamente que la violencia doméstica es un elemento dañino a nuestra sociedad, en especial a la institución familiar.[42] Precisamente, en su Exposición de Motivos la Ley 54 dispone que "[l]a violencia doméstica es un comportamiento antisocial que constituye un serio problema para la familia puertorriqueña". Ello, porque todos los componentes de ésta pueden ser víctimas de la violencia en el ámbito familiar. De manera que, aunque las mujeres usualmente son las víctimas principales de dicha violencia, lo anterior no sólo afecta a la mujer o al hombre, según sea el caso, sino que afecta directamente a los hijos y consecuentemente a la institución familiar. A tales efectos, el legislador señaló que "[t]olerar la violencia doméstica hoy, contribuye a la desintegración de la familia, a fomentar la criminalidad y al debilitamiento de los valores de la convivencia humana".[43] Por tal razón,

---

[40] Íd., págs. 10-11.

[41] Véase, la discusión de la aprobación del proyecto en el Pleno del Senado, Diario de Sesiones de la Asamblea Legislativa (Senado), 26 de junio de 1989, pág.2271 *et seq.*

[42] Pueblo v. Ruiz, 159 D.P.R. 194, 201 (2003).

[43] Exposición de Motivos, Ley Núm. 54 de 15 de agosto de 1989.

hemos reconocido que la política pública enunciada en la Ley 54 tiene como propósito cardinal el "fortalecer la institución familiar, que se visualiza como una política que surge y se ampara en la unión sentimental y legal entre un hombre y una mujer".[44]

## C

El Art. 3.1 de la Ley Núm. 54, tipifica el delito de maltrato de la manera siguiente:

> Toda persona que empleare fuerza física o violencia psicológica, intimidación o persecución en la persona de su cónyuge, ex cónyuge, o la persona con quien cohabita o haya cohabitado, o la persona con quien sostuviere o haya sostenido una relación consensual, o la persona con quien haya procreado un hijo o hija, para causarle daño físico a su persona, a los bienes apreciados por ésta, excepto aquellos que pertenecen privativamente al ofensor, o a la persona de otro o para causarle grave daño emocional…

Del citado artículo se desprende que éste es aplicable a las relaciones afectivas entre cónyuges, ex cónyuges, personas que cohabiten o hayan cohabitado, que sostengan o sostuvieren una relación consensual o entre personas con quien se haya procreado un hijo o una hija. En torno a las primeras dos relaciones, claramente ambas se sustentan en la figura del matrimonio. Esto es, la disposición le es aplicable a la relación entre esposa y esposo (los cónyuges) y a la que subsiste entre aquellos que estuvieron casados en algún momento (los ex cónyuges).

---

[44] Pueblo v. Ruiz, *supra*, pág. 202.

Por su parte, el artículo también hace mención de la relación entre personas que cohabitan o hayan cohabitado. En ese sentido la Ley define "cohabitar" como "sostener una relación consensual similar a la de los cónyuges".[45] En otras palabras, como ya este Tribunal ha reconocido, lo anterior se refiere al concubinato.[46]

En cuanto a la expresión "relación consensual", ésta no estuvo en los proyectos originales y la misma fue añadida al final del proceso. En el caso Pueblo v. Ruiz, 159 D.P.R. 194 (2003), tuvimos la oportunidad de interpretarla. En esa ocasión determinamos que dicha expresión no incluía a las parejas del mismo sexo, por lo que concluimos que la Ley 54 sólo aplica a relaciones de parejas heterosexuales. No obstante, al interpretar lo que es una relación consensual según la ley, sostuvimos que ésta incluye a aquellas parejas compuestas por un hombre y una mujer que aunque no necesariamente cohabitan, llevan una relación afectiva-consensual.[47] Lo anterior fue ejemplificado con la exposición de la relación amorosa íntima que pudieran llevar unos novios que no conviven.[48] Ello, porque tal interpretación es cónsona con "la política pública a favor de la familia, ya que en estas

---

[45] Art. 1.3 inciso (d) de la Ley Núm. 54, 8 L.P.R.A. sec. 602.

[46] Pueblo v. Ruiz, supra, pág. 206; Véase, Domínguez Maldonado v. E.L.A., 137 D.P.R. 954 (1995); Caraballo Ramírez v. Acosta, 104 D.P.R. 474 (1975).

[47] Pueblo v. Ruiz, supra, pág. 208

[48] Íd.

relaciones muchas veces se tienen hijos en común, además de que en algunas ocasiones suponen un eventual matrimonio".[49] Por tal razón, podemos decir que el legislador distinguió entre la relación consensual en la que la pareja convive, la que llamó cohabitar, y la mera relación consensual, en la que no es necesario que la pareja viva bajo el mismo techo.

Ahora bien, es evidente que el artículo aquí en cuestión protege una serie de relaciones que trascienden el vínculo matrimonial. No obstante, el hecho de que se trascienda el vínculo matrimonial no significa que el legislador quiso incluir y proteger las relaciones adulterinas. Resulta claro del historial legislativo que el propósito de la Ley 54 es atender el maltrato y la violencia en el contexto familiar, ya sea entre cónyuges o entre los que cohabitan, o entre aquellos que fueron cónyuges o mantienen una relación consensual. Incluso aplica a aquellos que sin cohabitar o mantener una relación consensual procrearon un hijo entre sí. Sin embargo, nótese que la propia ley atiende asuntos de custodia de menores, alimentos para menores, domicilio de la pareja y las pertenencias personales, por lo que expresamente el legislador mantuvo siempre una clara tendencia a la protección del contexto familiar.

Por su parte, el Art. 130 del Código Penal de Puerto Rico dispone que cuando una persona casada tiene

---

[49] Íd.

relaciones sexuales con una persona que no sea su cónyuge incurrirá en el delito de adulterio.[50] Además, si ese delito "se comete por una mujer casada y un hombre soltero, o un hombre casado y una mujer soltera, el hombre soltero o la mujer soltera incurrirá en el delito de adulterio".[51] Este delito es análogo al Art. 129 del derogado Código Penal de 1974. Respecto a esto, la Doctora Nevares Muñiz señala que, "el legislador decidió mantener el delito en el Código Penal en protección a la unidad familiar y en su redacción incluyó los elementos que existían desde el Código de 1902 derogado".[52] Por consiguiente, es evidente que por décadas las relaciones adulterinas han sido ilegales en nuestra jurisdicción. Así lo dispuso nuestra Asamblea Legislativa.

La Ley 54 sólo hace mención del adulterio en las disposiciones sobre el desvío del procedimiento. Específicamente, el Art. 3.6 señala "que en el caso del delito de agresión sexual conyugal, el desvío del procedimiento sólo estará disponible para los casos en que el acusado sea el cónyuge o cohabite con la víctima al momento de la agresión sexual, siempre y cuando dicha cohabitación no sea adúltera…".[53] De esta forma, el legislador sólo mencionó las relaciones adulterinas para

---

[50] 33 L.P.R.A. sec. 4758.

[51] Íd.

[52] D. Nevares Muñiz, Nuevo Código Penal de Puerto Rico, 2da ed., San Juan, Ed. Instituto para el Desarrollo del Derecho, Inc., 2005, pág. 168.

[53] 8 L.P.R.A. sec. 636.

expresar claramente la inaplicabilidad de un beneficio de desvío. En ninguna otra parte del texto legal existe otra mención a las relaciones adulterinas.

## III

En el presente caso, se alegó que el Sr. José Miguel Flores Flores golpeó a la Sra. Carmen M. Romero Pérez y por tal actuación se le imputó haber infringido el Art. 3.1 de la Ley 54. Ello, porque alegadamente éstos cohabitaban y sostenían una relación consensual. No obstante, surge del expediente que la señora Romero Pérez declaró en la Vista Preliminar que la relación que ellos llevaban era una como de "novios" y en la que llegaron a sostener relaciones sexuales. Además, que simultáneamente a dicha relación afectiva, ésta se encontraba legalmente casada con otro hombre.

Ahora bien, no surge del expediente que el señor Flores Flores conviviera con la perjudicada, por lo que no se puede sostener que éstos cohabitaban. Lo anterior, no fue negado por ninguno de éstos. El señor Flores Flores y la perjudicada sostenían conscientemente una relación adulterina. Así, pues, nos corresponde determinar si la relación entre ambos constituyó una relación consensual para fines de la legislación en cuestión y si ésta, a su vez, es aplicable a una relación adulterina.

Al examinar el historial legislativo de la Ley 54 resulta evidente que ese estatuto está dirigido a la

intervención y prevención de la violencia en las relaciones de pareja en el contexto familiar. Surge con claridad el deseo legislativo de proteger la integridad misma de la familia y sus miembros. El Art. 3.1 de la Ley 54 dispone su aplicación a las relaciones de pareja en el contexto familiar: cónyuges, ex cónyuge y aquellos que cohabitan. Además, tal es el fundamento familiar que incluso aplica a aquellos que, aunque no les apliquen ninguna de estas categorías ni mantengan una relación consensual, hayan procreado un hijo en común. Ello es así, ya que existiría un derecho de relaciones paterno y materno filiales de ese hijo que los vinculará por el resto de sus vidas. Cabe señalar, y atendiendo la inquietud de la opinión disidente de la compañera Jueza Asociada señora Fiol Matta, que ante la clara intención legislativa en pro de la institución familiar y el bienestar de sus miembros, en el caso de que se procree un hijo en el seno de una relación adulterina, sí la ley le sería aplicable. La protección no adviene por la relación estar enmarcada en una de índole consensual o de cohabitación, sino, por el hecho de que hayan procreado un hijo. Ello, es cónsono con el interés del Estado de proteger a los hijos de la violencia entre sus padres. Lo anterior, es claramente sustentable al examinar la intención legislativa de la Ley 54. Además, cónsono con el referido contexto expresamos que en el caso de la relación consensual ésta puede entenderse por la de los novios que

sin convivir pueden llegar a mantener una relación afectiva.[54]

Sin embargo, de los diferentes tipos de pareja a los que el Art. 3.1 hace mención, no encontramos un mandato expreso del legislador que incluya las relaciones adulterinas. Ello es importante porque no debemos perder de perspectiva que estamos ante un estatuto con disposiciones penales, por lo que tenemos que abordarlo restrictivamente conforme al principio de legalidad. Contrario a la postura del Procurador General, no podemos interpretar el referido artículo de forma expansiva y hacer de la definición de pareja una enumeración *numerus apertus*.

Entre los principios esenciales del Derecho Penal está el que nos impide crear delitos por analogías y por ende, no podemos crear elementos de un delito que no han sido considerados por el legislador. En nuestro sistema de gobierno, la Legislatura, como representante del pueblo, es la única que está legitimada para criminalizar una conducta. Aunque es correcto que la Ley 54 está enfocada en la víctima, ello no puede utilizarse como subterfugio para crear los elementos de un delito por analogía y violar el debido proceso de ley.

En Puerto Rico las relaciones adulterinas son claramente penalizadas en el Código Penal. Mas aún, es evidente que la Asamblea Legislativa ha identificado el

---

[54] Véase, Pueblo v. Ruiz, *supra*, pág. 208.

adulterio como un mal social y destructor de nuestra familia al punto que lo ha mantenido como delito reiteradamente por ya más de un siglo. Por ende, y ante tal realidad, para poder establecer que esa misma Asamblea Legislativa que ha insistido en combatir este mal social, ahora lo pasa por alto en los casos de violencia doméstica, es necesario que surja claramente del texto de la ley. No obstante, esto no es así. Ni de su faz, ni de su historial, surge lo sostenido por el Procurador General. Por consiguiente, sin un claro mandato legislativo, no podemos expandir la definición de "relación consensual" para abarcar relaciones que son ilegales en nuestra jurisdicción.

Por otro lado, no podemos utilizar la única mención del adulterio en la ley, que trata sobre la negación de un beneficio al proceso de desvío, para llegar a la conclusión de que si el legislador hubiese querido exceptuar las relaciones adúlteras de la aplicación de la Ley 54, hubiese hecho una expresión clara en la ley. Sostener esa conclusión implicaría ignorar los principios de hermenéutica legal penal, los cuales prohíben tipificar conductas como delitos a base del silencio del legislador o por analogías.[55] La interpretación de los estatutos penales debe ser restrictiva en lo que desfavorece al acusado y liberal en lo que lo favorece. Por más loable

---

[55] Véanse, Arts. 2 y 3 del Código Penal de Puerto Rico, 33 L.P.R.A. secs. 4630-4631.

que pueda ser la posición en pro de la víctima, en circunstancias como las de este caso, ese enfoque es ajeno a la normativa vigente en nuestra jurisdicción, máxime cuando el legislador ha provisto un mecanismo a través del Código Penal para hacerle justicia a esa víctima. Es un principio elemental que en el campo penal toda conducta tipificada como delito, así como sus penas, tienen que estar expuesta con claridad en la ley. Por tal razón, entendemos que conforme al principio de legalidad si el legislador quería aplicar la Ley 54 a las relaciones adulterinas tenía que hacerlo expresamente.

Asimismo, si interpretamos liberalmente la definición de "relación consensual" y nos enfocamos sólo en la víctima, no sólo violaríamos el principio de legalidad sino que infringiríamos la política pública enunciada en la Ley 54. Dicha política pública tiene como propósito cardinal el fortalecimiento de la institución familiar, la cual se visualiza como una política que surge y se ampara en la unión sentimental y legal entre un hombre y una mujer.[56]

Por tal razón, al examinar el historial legislativo, así como el Derecho, entiendo que la relación consensual adulterina no está protegida por la Ley 54. No existen bases suficientes en el historial para incluir en la definición de "relación consensual" la relación afectiva entre un hombre y una mujer en la que cualquiera de ellos

---

[56] Pueblo v. Ruiz, *supra*, pág. 201.

esté legalmente casado. La relación antedicha claramente sería una relación adulterina, por ende, ilegal. Cabe señalar, que del expediente surge que éste era el tipo de relación que conscientemente, el peticionario y la perjudicada, sostenían. De esta forma, como el Art. 3.1 de la Ley 54 no abarca ese tipo de relación tenemos que concluir que ésta no está protegida por esa disposición legal. Por lo tanto, procesar al acusado bajo un estatuto que no le es aplicable claramente violaría el principio de legalidad.

Ahora bien, lo anterior no significa que la perjudicada queda desprovista de remedios en ley. Por ejemplo, la Ley Núm. 284 de 21 de agosto de 1999, conocida como Ley contra el Acecho en Puerto Rico, según enmendada,[57] cuenta con varios mecanismos de protección que pueden utilizarse en estos casos.[58] El Art. 2 de este estatuto señala que el Gobierno se reafirma en su política pública de luchar contra cualquier tipo de manifestación de violencia que atente contra los valores de paz, seguridad, dignidad y respeto. Esta ley aplica categóricamente a personas que hayan tenido una relación de cortejo. Al amparo de la misma, un tribunal podrá expedir una Orden de Protección a una persona que haya sido víctima de acecho.

---

[57] 33 L.P.R.A. sec. 4013 *et seq.*

[58] Véase, Pueblo v. Ruiz, *supra*, pág. 213, escolio 20.

De igual forma, el Ministerio Público cuenta con varias disposiciones del Código Penal con las cuales pudiera reiniciar el proceso penal. Nuestra postura simplemente se sustenta en que conforme a los hechos y el Derecho que circunscriben el caso de autos, el Art. 3.1 de la Ley 54 no es de aplicación.

Por último, contrario a lo implicado por la apreciada y distinguida compañera Jueza Asociada señora Fiol Matta al final de su Opinión Disidente, mi posición no obedece a "ideas, actitudes o conductas discriminatorias". Mucho menos me hago "cómplice de la violencia de pareja que tantas vidas está destruyendo en Puerto Rico". Hasta el día en que podamos erradicar el terrible mal de la violencia desmedida que sufre nuestro pueblo, los ciudadanos, sin importar su estatus civil, contarán con los remedios que provee la Ley para la Prevención e Intervención con la Violencia Doméstica o, en su defecto, con los mecanismos también efectivos que proveen nuestro Código Penal y otras leyes especiales.

Por otro lado, mi criterio no obedece a ningún prejuicio pues la norma cardinal del Derecho Penal que constituye el principio de legalidad no conoce estatus civil alguno. Más bien asegura un proceso sustantivo justo al acusado, sin importar cuál sea su relación con la víctima. Por eso no puedo refrendar la posición de la compañera Jueza Asociada Fiol Matta pues, en su análisis, ésta va más allá de la mera interpretación de la ley

pretendiendo, mediante *fiat judicial*, ampliar el alcance del delito que se le imputa al peticionario Flores Flores. Avalar que se amplíe el alcance de un delito por *fiat judicial* sería nefasto y un precedente peligroso. No podemos arrogarnos el rol de la Asamblea Legislativa. Le compete a dicho Cuerpo formular el marco jurídico que establecerá la política pública y legislar al respecto.

La interpretación que hagamos de la Ley Núm. 54, *supra*, debe ser cónsona con la política pública enunciada por el Legislador y guiada por el espíritu que la originó. Como señalamos en Pizarro v. Nicot, 151 D.P.R. 944, 951 (2000):

> Reiteradamente hemos resuelto que es principio cardinal de hermenéutica que '[a]l interpretar una disposición específica de una ley, los tribunales deben siempre considerar cuáles fueron los propósitos perseguidos por la Asamblea Legislativa al aprobarla y nuestra determinación debe atribuirle un sentido que asegure el resultado que originalmente se quiso obtener'... Nuestra obligación fundamental en estos casos, es imprimirle efectividad a la intención legislativa, propiciando de esta forma la realización del propósito que persigue la ley... Al interpretar y aplicar un estatuto hay que hacerlo teniendo presente el propósito social que lo inspiró...". (Citas omitidas.)[59]

A toda ley se le dará la interpretación que mejor responda a los propósitos que persigue. Los tribunales deben interpretar la ley como un ente armónico, dándole

---

[59] Véase además, Vázquez v. Administración de Reglamentos y Permisos, 128 D.P.R. 513 (1991); González Pérez v. E.L.A., 138 D.P.R. 399 (1995).

sentido lógico a sus diferentes disposiciones, supliendo las posibles deficiencias cuando esto fuere necesario.[60] Vía interpretación forzada no podemos jurídicamente ampliar el alcance de un estatuto ignorando el espíritu que lo motivó, sobre todo cuando se trata de un estatuto penal, y dicha interpretación militaría en contra del acusado. Como señalan los profesores Bernier y Cuevas Segarra:

> En el desempeño normal de sus funciones, los tribunales están obligados a respetar la voluntad legislativa aunque los magistrados discrepen personalmente de la sabiduría de los actos legislativos. Interpretar una ley en forma que sea contraria a la intención del legislador implica la usurpación por la rama judicial de las prerrogativas de la rama legislativa. Por tanto, el intérprete debe abstenerse de sustituir el criterio legislativo por sus propios conceptos de lo justo, razonable y deseable.[61]

Por todo lo anterior, entiendo que el Tribunal de Apelaciones actuó correctamente al concluir que en la determinación de causa probable para acusar en la Vista Preliminar la prueba no sostenía la concurrencia de todos los elementos del delito imputado. Por tal razón, su

---

[60] _Pizarro_ v. _Nicot_, supra, _González Pérez_ v. _E.L.A._, supra; _Zambrana_ v. _E.L.A._, 129 D.P.R. 740 (1992); _Gobernador de P.R._ v. _Alcalde de Coamo_, 131 D.P.R. 614 (1992); _Torres_ v. _Castillo Alicea_, 111 D.P.R. 792 (1981); Bernier y Cuevas Segarra, _Aprobación e Interpretación de las Leyes en Puerto Rico_, 2da ed. rev., San Juan, Pub. J.T.S., Inc., 1987.

[61] Bernier y Cuevas Segarra, op. cit., pág. 299.

actuación de declarar con lugar la moción al amparo de la Regla 64(p) de Procedimiento Criminal presentada por el peticionario y desestimar la acusación, fue acertada.


                              Erick V. Kolthoff Caraballo
                                   Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico
        Peticionario

                                CC-2007-148        *Certiorari*

        v.

José Miguel Flores Flores
        Recurrido

Opinión disidente emitida por la Jueza Asociada señora FIOL MATTA a la cual se unen el Juez Presidente señor HERNÁNDEZ DENTON y la Juez Asociada señora RODRÍGUEZ RODRÍGUEZ

En San Juan, Puerto Rico, a 23 de marzo de 2011.

> Los progresos sociales […] se realizan en función del progreso de las mujeres hacia la libertad, y las decadencias de orden social se realizan en función de la disminución de la libertad de las mujeres.[62]
>
> Charles Fourier

La división de los miembros del Tribunal avala hoy una sentencia del foro apelativo que le niega la protección de la Ley 54 a una mujer por la sola razón de ser adúltera. Esa ratificación excluye a los agresores dentro de relaciones

---

[62] C. Fourier, Teoría de los cuatro movimientos y de los destinos generales, Barcelona, Ed. Barral, 1974, pág. 167.

adulterinas del rigor de la Ley para la Prevención e Intervención con la Violencia Doméstica, también conocida como la Ley 54.[63] El efecto práctico de dicha exclusión es privilegiar a los agresores adúlteros y dar carta blanca al maltrato de pareja en esas situaciones, so color de proteger la institución familiar.

Poco pesa en el ánimo de quienes se niegan a aplicar la Ley a los hechos del presente caso el que otra mujer haya sido víctima de la violencia de pareja en nuestro país. La Ley 54, que tipifica el delito de maltrato entre parejas de diversos tipos,[64] se aprobó para atender este mal.[65] Resolver que sus disposiciones no aplican a un incidente de violencia que surge dentro de una relación consensual, únicamente porque uno de sus participantes está casado con otra persona, conlleva ignorar el claro propósito de la Ley y vendarse los ojos ante la innegable realidad de que la violencia machista, no importa el tipo de relación en que ocurra, está cobrando decenas de vidas anualmente y afectando a miles de personas en nuestro país.

---

[63] Ley para la Prevención e Intervención con la Violencia Doméstica, Ley Núm. 54 de 15 de agosto de 1989, 8 L.P.R.A. secs. 601-664.

[64] Art. 3.1, Ley para la Prevención e Intervención con la Violencia Doméstica, Ley Núm. 54 de 15 de agosto de 1989, 8 L.P.R.A. sec. 631.

[65] La violencia doméstica también se conoce como "violencia machista". En algunos países, se ha denominado "terrorismo sexual". Carole J. Sheffield, *Sexual Terrorism* en L. O'Toole and J. Schiffman, Gender Violence: Interdisciplinary Perspectives, 2da ed., New York, New York University Press, 1997, pág. 111.

Decisiones como esa desechan el fin expreso de proteger la vida, la seguridad y la dignidad de las personas involucradas en relaciones de pareja que persiguió la adopción de ese estatuto. Limitar los remedios y mecanismos de protección para las víctimas de la violencia de pareja, injustificadamente y en obvia contravención con el verdadero espíritu de la Ley 54, es un error judicial que pagarán con más sufrimientos las propias perjudicadas. Como no puedo guardar silencio ante semejante desacierto, disiento.

I

El señor José Miguel Flores Flores y la señora Carmen Romero Pérez mantuvieron una relación de pareja, que incluyó relaciones sexuales sin cohabitación, por aproximadamente diez meses, estando ella casada con otro hombre. En mayo de 2006, Flores Flores y Romero Pérez tuvieron una discusión que concluyó con actos de agresión de él contra ella y su posterior denuncia. Los hechos violentos incluyeron interceptar el vehículo de la señora Romero Pérez, golpearla, halarle el pelo y apretarla por el cuello. El Ministerio Público le imputó al señor Flores Flores haber cometido el delito de maltrato tipificado en el artículo 3.1 de la Ley 54.

Tras la vista preliminar y la lectura de acusación, el señor Flores Flores solicitó que se desestimara el caso bajo el fundamento de que no se determinó causa probable con arreglo a la ley y al derecho, establecido en la Regla

64(p) de Procedimiento Criminal.[66] A su favor, el acusado argumentó que la Ley 54 no aplica a relaciones adúlteras, por lo que no estaban presentes los elementos del delito imputado. El Ministerio Público replicó que la Ley 54 no contiene disposición alguna sobre el estado civil de la perjudicada y que la relación que sostuvo el acusado con la víctima está contemplada en el concepto relación consensual que especifica en artículo 3.1. El Tribunal de Primera Instancia denegó la petición de desestimación. El Tribunal de Apelaciones revocó al de instancia, por entender que las relaciones adulterinas quedan fuera del ámbito protector de la Ley 54.

Luego de examinar detenidamente el expediente y el derecho aplicable, revocaría la Sentencia del tribunal apelativo y reinstalaría la acusación para que el foro primario continúe con los procedimientos. Sin embargo, como la división de este Tribunal confirma la sentencia recurrida, no puedo menos que disentir.[67]

II

## A.  La Ley 54: su aprobación y objetivos

Diversos proyectos legislativos sometidos desde 1984 reconocían el problema social de la violencia de pareja,[68]

---

[66] 34 L.P.R.A. Ap. II, R. 64(p).

[67] El Juez Asociado señor Rivera García, quien, como juez superior, dictó la resolución revocada por el Tribunal de Apelaciones, está inhibido.

[68] Véase el Proyecto del Senado 1197 del cuatrienio de 1981-1984, que proponía añadir el artículo 95-A al Código Penal

pero no fue hasta 1989 que se logró aprobar una ley especial para atenderlo. El 2 de febrero de 1989, la senadora Velda González presentó el Proyecto del Senado 90, para añadir el artículo 122-A al Código Penal de Puerto Rico y tipificar el delito de maltrato conyugal.[69] Posteriormente, el Ejecutivo presentó el Proyecto del Senado 470 y el Proyecto de la Cámara 615. Tras la celebración de vistas públicas, foros y reuniones con profesionales de la salud mental, educación y derecho, se redactó un proyecto de ley sustitutivo que recogió las inquietudes de los diversos borradores y las recomendaciones de los expertos. Entonces, se aprobó la Ley para la Prevención e Intervención con la Violencia Doméstica o Ley 54.

Como todo análisis de un estatuto que tipifica una conducta como delictiva, nuestro estudio de la Ley 54 nos requiere, en primer lugar, identificar cuál fue el interés único que la Asamblea Legislativa pretendió tutelar, al tipificar el delito de maltrato en la relación de pareja. Ello, pues "la indagación y concreción del bien jurídico protegido es cuestión previa en todo estudio jurídico de un tipo delictivo".[70] Concretamente, el bien jurídico ha de

---

para tipificar el delito de maltrato conyugal, y los Proyectos del Senado 497 y 1140 del cuatrienio 1985-1988.

[69] En 1989, la senadora Velda González también presentó el Proyecto del Senado 91, relacionado con el mismo asunto.

[70] N. Castelló Nicás, *Problemática sobre la concreción del bien jurídico protegido* en A. García Vitoria y C. Aránguez

definirse "como el objeto inmediato de protección de la norma penal".[71] Sobre esto, el profesor Lascuraín Sánchez explica que

> [l]a norma penal es una directriz coactiva de conducta que, por una parte, aísla conceptualmente un determinado tipo de comportamientos y, por otra, pretende su evitación o su realización a través de la amenaza de la pena y de los diversos efectos… que ésta despliega en sus destinatarios. El bien jurídico-penal indica sintéticamente la razón principal de la coacción, al expresar el objeto afectado por los comportamientos amenazados y cuya protección es el fin que ha motivado la puesta en marcha del mecanismo instrumental penal.[72]

Para determinar cuál es el bien jurídico protegido por la norma penal tenemos que examinar las conductas prohibidas "en relación con el enunciado legal principal, con el tipo inicial del injusto [y] con otras normas, de incriminación y permisivas, con las que aquel enunciado se relaciona".[73] Esto porque la norma penal representa el valor social que el legislador le brinda a la realidad

---

Sánchez, Estudios penales sobre la violencia doméstica, Madrid, Edersa, 2006. Este concepto del "bien jurídico" se refiere al interés protegido por la norma penal y, por tal razón, es de gran importancia a lo largo de la historia moderna del Derecho Penal.

[71] J.A. Lascuraín Sánchez, Bien Jurídico y objeto protegible, Anuario de derecho Penal y Ciencias Penales-Número LX, Enero de 2007, pág. 125-126. "El vocablo <<bien>> hace referencia al objeto de una valoración positiva y el adjetivo <<jurídico>> que le acompaña alude al sujeto y a la forma de dicho juicio". Id., pág. 123.

[72] Id., págs. 126-127.

[73] Id., pág. 127.

agredida y su vulnerabilidad.[74] Por consiguiente, examinemos

en detalle la Ley 54, su historial legislativo y los

estudios que se han realizado sobre la violencia de pareja.

Para empezar, el título de esta legislación es

inexacto porque, como veremos, no se ajusta a su contenido.

El término "violencia doméstica" cubre conductas no

contempladas por la Ley 54. Ganzenmüller aclara que la

violencia doméstica se entiende como

> toda acción u omisión física, psíquica o sexual
> practicada sobre los miembros más débiles de una
> comunidad familiar, fundamentalmente las
> ejercidas sobre los menores, mujeres y ancianos,
> así como las derivadas de la ruptura de la
> convivencia o relación afectiva, que cause daño
> físico o psicológico o maltrato sin lesión.[75]

Sin embargo, la Ley 54 no se limita a prohibir el maltrato

en el ámbito doméstico sino que criminaliza la violencia

contra cualquier pareja o ex pareja.[76] Es decir, puede que

la víctima y el agresor compartan el espacio doméstico o

puede que no; lo importante es que sostengan o hayan

sostenido una relación íntima. Por otro lado, aunque la

Ley 54 regula de forma secundaria asuntos relacionados a la

violencia entre la pareja, como la custodia de los hijos e

---

[74] *Id.* Una vez identificado el bien jurídico, éste, "en un viaje de vuelta, [...] precisa los contornos de la norma" penal. *Id.,* pág. 128.

[75] C. Ganzenmüller Roig y otros, La violencia doméstica: Regulación legal y análisis sociológico y multidisciplinar, Barcelona, Bosh, 1999, pág. 14-15.

[76] Véase el artículo 1.3(m) de la Ley 54, 8 L.P.R.A. sec. 602(m). Le damos énfasis a que esta ley aplica a situaciones en las cuales ya no existe la relación afectiva íntima.

hijas de los actores del delito, no tipifica como delito el maltrato de menores o ancianos. Para proteger a estos miembros del espacio doméstico hay artículos específicos en el Código Penal.[77]

Por consiguiente, el propósito principal de la Ley 54 fue terminar con la violencia de pareja y proveer protección inmediata a las víctimas de este tipo de agresión, quienes eran, principalmente, mujeres.[78] Según dispone el artículo 1.2 de la Ley 54, que establece la política pública del estatuto, se pretendía "dar énfasis a atender las dificultades que las situaciones de violencia doméstica presentan, particularmente a mujeres y menores, para preservar su integridad física y emocional, procurar

---

[77] Véanse las secciones segunda y tercera del Código Penal de Puerto Rico de 2004, que regulan la protección debida a los menores y a las personas de edad avanzada, respectivamente. 33 L.P.R.A. secs. 4759-4767. Otras leyes que protegen a estas personas, consideradas débiles dentro de la relación social, son La Carta de Derechos de la Persona de Edad Avanzada, Ley Núm. 121 de 12 de julio de 1986, y la Ley para el Bienestar y la Protección Integral de la Niñez, Ley Núm. 177 de 1 de agosto de 2003.

[78] Informe Conjunto de las Comisiones de lo Jurídico, de Desarrollo Cultural y de Asuntos de la Mujer, Diario de Sesiones, Procedimientos y Debates de la Asamblea Legislativa del lunes 26 de junio de 1989, Núm. 66 [en adelante, Informe Conjunto], pág. 2289-2290; E. Vicente, Beyond Law Reform: The Puerto Rican Experience in the Construction and Implementation of the Domestic Violence Act, 68 Rev. Jur. U.P.R. 553, 580-581 (1999). No cabe duda que las mujeres siguen siendo las principales víctimas de este problema social. Basta mirar la prensa diaria de nuestro país para concluir que éstas son las que mayormente padecen este mal.

su seguridad y salvar sus vidas".[79] Es por esto que, en

Pueblo v. Ruiz, explicamos que las ponencias ante las

comisiones legislativas revelan que el enfoque principal de

la legislación es la protección de las mujeres maltratadas

en la relación de pareja.[80]

Más importante aun, el texto de la Ley establece el

objetivo de lograr suprimir la justificación cultural de la

violencia contra las mujeres que le atribuye a éstas ser

causa de su victimización cuando alegadamente no se

comportan según las expectativas de los varones. Esta

justificación de la violencia de pareja se fundamenta en la

convicción de que la mujer es propiedad del hombre, es

decir, en una ideología tradicionalmente patriarcal.[81]

---

[79] Art. 1.2 de la Ley 54, 8 L.P.R.A. sec. 601. Ciertamente, la Ley 54 tenía objetivos adicionales, como tipificar y prevenir la violencia en las relaciones de pareja y rehabilitar a los agresores. También se interesaba que las autoridades del orden público fueran responsables e intervinieran eficazmente en el arresto del agresor, la protección de la víctima y la recopilación de la información relativa a los incidentes de este tipo de violencia. Informe Conjunto, *supra.*

[80] 159 D.P.R. 194 (2003). A pesar de que el maltrato contra las mujeres era el principal problema que dominó el proceso legislativo de la Ley 54, el proyecto terminó aprobándose con un lenguaje neutral en cuanto al hombre y la mujer. Reconociendo esta realidad, en Pueblo v. Figueroa Santana, 154 D.P.R. 717, 724 (2001), indicamos que, aunque en su aplicación la Ley 54 generalmente protege a las mujeres víctimas de maltrato, se creó también para proteger a los hombres "que, en ocasiones, también son víctimas silentes de este triste drama".

[81] Ponencia de la Organización Puertorriqueña de la Mujer Trabajadora (OPMT) en torno al Proyecto 470 del Senado y 615 de la Cámara de Representantes sobre Violencia Doméstica [en adelante, Ponencia OPMT], pág. 4. En ésta se hace énfasis en la importancia de que se tipifique el

Nuestra sociedad, como tantas otras, respondía a esta mentalidad patriarcal hegemónica, que concibe la violencia de pareja como un problema que debe resolverse en el ámbito privado o doméstico.[82] Así, por razones histórico culturales, no se concebía que golpear a una compañera íntima fuese un crimen o un delito.

Por esa razón, antes de la Ley 54, como regla general, las autoridades públicas no intervenían en este tipo de situación.[83] La Ley 54 expresamente reconoce la importancia

---

delito de maltrato para "ayudar a combatir la visión de que la agresión no es algo tan malo cuando se comete contra la mujer, dentro de la familia". *Véase* M. Comas d'Argemir i Cendra, *Poder Judicial y Violencia Doméstica, ¿Qué hemos logrado? ¿Qué debemos lograr?* en I. Tena Franco, La Violencia Doméstica: Su enfoque en España y en el Derecho Comparado, Madrid, Consejo General del Poder Judicial, 2005, pág. 15-16. Véase, además, el Informe sobre el Discrimen por Razón de Género en los Tribunales de Puerto Rico, Puerto Rico, Tribunal Supremo, Comisión Judicial Especial para Investigar el Discrimen por Género en los Tribunales de Puerto Rico, agosto 1995 [en adelante, Informe sobre Discrimen en Tribunales], pág. 322.

[82] *Véase* R. S. Bonilla, Ay! Ay! Amor: No me quieras tanto. El marco social de la violencia contra las mujeres en la vida conyugal, Centro de Investigaciones Sociales de la Universidad de Puerto Rico, Centro Coordinador de Estudios, Recursos y Servicios a la Mujer (CERES), 1985; Comas d'Argemir i Cendra, *supra*, pág. 19; Ganzenmüller Roig, *supra*, pág. 15. *Véase*, además, Informe sobre Discrimen en Tribunales, *supra*, pág. 318. En Pueblo v. Ruiz Martínez, 159 D.P.R. 194, 204-205 (2003), indicamos que el objetivo de la Ley 54 es "consustancial con el propósito de liberar a [las mujeres] de las desventajas que supone su rol tradicional en el sistema social del patriarcado, el cual las relega a un rol secundario y pasivo dentro de la relación de pareja".

[83] Ponencia OPMT, *supra*. La OPMT explica que la legislación puede aliviar el problema de que las autoridades se nieguen a tramitar o desalienten las querellas de las mujeres contra la pareja que las maltrata. *Véase*, además, R. M. Silva Bonilla, Hay amores que matan: La violencia contra

de transformar esta mentalidad.  Sobre ello, el artículo

1.2 de la Ley 54 dispone lo siguiente:

> La violencia doméstica es una de las manifestaciones más críticas de los efectos de la inequidad en las relaciones entre hombres y mujeres.  Las ideas, actitudes y conductas discriminatorias también permean las instituciones llamadas a resolver y a prevenir el problema de la violencia y sus consecuencias. Los esfuerzos de estas instituciones hacia la identificación, comprensión y atención del mismo han sido limitados y en ocasiones inadecuados.[84]

Ante este panorama, la Ley 54 tuvo la encomienda de

informar de forma contundente a la ciudadanía y a los

oficiales del orden público que la violencia de pareja no

sería tolerada. Además, aunque la Ley utilizó lenguaje

neutral, advirtiendo que este tipo de violencia es

igualmente delictiva cuando es perpetrada por la mujer,

reconoció la realidad de que esos casos eran ínfimos.[85]  El

mensaje no podía ser más claro: ya el hombre no podía

agredir a "su" mujer sin que alguien interviniera.[86] Con

este mensaje, los legisladores intentaron eliminar

actitudes, patrones de conducta y prácticas de dominación

que promovían y condonaban la violencia de pareja.

---

las mujeres en la vida conyugal, Río Piedras, Ediciones Huracán, 1990, pág. 63.

[84] 8 L.P.R.A. sec. 601.

[85] Véanse el Memorial Explicativo del Proyecto de la Cámara 615 y el Proyecto del Senado 470 [en adelante, Memorial Explicativo], págs. 2-3; la Exposición de Motivos del Proyecto Sustitutivo al Proyecto del Senado 90 y al Proyecto del Senado 470, págs. 1-2, y la Ponencia de la Comisión para los Asuntos de la Mujer, Oficina del Gobernador, para el Proyecto del Senado 470, págs. 2-3.

[86] Silva Bonilla, *supra,* pág. 61.

A pesar de todo esto, la Opinión de Conformidad señala insistentemente que el propósito de la Ley es proteger la integridad familiar. Luego de citar en su totalidad la política pública de la Ley, establecida en su artículo 1.2, y de reconocer que "es evidente que ésta se fundamenta en el sentido máximo de proteger la vida, la seguridad y la dignidad de los hombre y las mujeres",[87] la Opinión indica que, como en esos párrafos también se habla de la importancia del núcleo familiar, se deben interpretar las disposiciones de la Ley 54 con el fin de fortalecer la familia como institución y amparar sólo a quienes constituyen uniones legales entre hombres y mujeres.[88] Pero repetir en múltiples ocasiones esa pretensión y resaltar la mención de la palabra familia en la Ley y en nuestra jurisprudencia no transforma la política pública de la Ley 54 de una centrada en la eliminación de la violencia entre parejas a una enfocada en la unión familiar. Además, cabe preguntarse qué unión familiar o qué tipo de familia es la que la Opinión de Conformidad pretende proteger. ¿La que conforman una mujer y su agresor por el hecho de estar casados o poderse casar? ¿Realmente hay familia que proteger en una relación de violencia? ¿Y qué hay de un niño que nace o puede nacer de una relación extramarital;

---

[87] Opinión de Conformidad, pág. 13. Más adelante en la Opinión, se vuelve a reconocer que "la Ley 54 está enfocada en la víctima". *Id.*, pág. 22.

[88] *Id.*, págs. 12-16.

acaso no forma parte de una familia? Entonces, ¿por qué no merece protección la madre o futura madre de ese niño cuando su pareja dentro de la relación consensual adúltera la agrede?

Los ensayos de hermenéutica de la Opinión de Conformidad no pueden cambiar el propósito esencial de la Ley 54, expuesto diáfanamente como sigue:

> El Gobierno de Puerto Rico se reafirma en su compromiso constitucional de proteger la vida, la seguridad y la dignidad de hombres y mujeres. Además, reconoce que la violencia doméstica atenta contra la integridad misma de la familia y de sus miembros y constituye una seria amenaza a la estabilidad y a la preservación de la convivencia civilizada de nuestro pueblo.
> Como política pública, el Gobierno de Puerto Rico repudia enérgicamente la violencia doméstica por ser contraria a los valores de paz, dignidad y respeto que este pueblo quiere mantener para los individuos, las familias y la comunidad en general.[89]

Es claro que la protección de "la vida, la seguridad y la dignidad" de las personas que forman parte de la relación de pareja es el fin primordial de esta legislación. La preservación de la convivencia, no sólo de los miembros de cada familia sino de la sociedad en general y de todos los individuos que la componen, es una consecuencia lógica del control de la violencia de pareja; es un objetivo general e incidental al propósito principal y específico de la Ley 54. La Ley no propone mantener los valores de paz, dignidad y respeto sólo para ciertos tipos de parejas o para quienes encajan en determinado molde de

---

[89] 8 L.P.R.A. sec. 601.

familia; son principios que desea que imperen para el beneficio de todas las personas que conviven en nuestro país.[90]

**B. La necesidad de una ley especial**

Debemos recordar que las leyes penales especiales se crean cuando los estatutos penales tradicionales han demostrado no ser suficientes para garantizar la protección del bien jurídico que la sociedad interesa resguardar. El historial legislativo de la Ley 54 refleja que ésta fue necesaria porque las leyes existentes no proveían un remedio adecuado para atender las características particulares del maltrato entre pareja.[91] Por eso, llama la atención que la Opinión de Conformidad despache el problema de la perjudicada con mencionar que ésta no queda desprovista de remedios, ya que puede utilizar la orden de protección contra el acecho y el Ministerio Fiscal cuenta con las disposiciones generales del Código Penal para reiniciar el proceso contra el agresor.[92]

---

[90] La Opinión de Conformidad asevera que las reglas de interpretación, y específicamente la que ordena que los estatutos penales que desfavorecen a los acusados se interpreten restrictivamente, no pueden utilizarse para menoscabar la intención legislativa. Opinión de Conformidad, pág. 8, citando a Pueblo v. Figueroa Pomales, 172 D.P.R. 403 (2007). No obstante, ignora el propósito evidente de la Ley 54, invierte el orden de prioridades de la legislación y propone su propia interpretación a favor la integridad familiar, como alternativa al fin indudable de proteger a las víctimas de la violencia de pareja.

[91] Informe Conjunto, *supra*, pág. 2290. Para ello, la Ley 54 combina remedios civiles y penales.

[92] Opinión de Conformidad, pág. 25-26.

La realidad es que la violencia o maltrato de pareja tiene unas cualidades especiales que la diferencian de otros tipos de agresión. Se requiere un trato jurídico especial precisamente porque, dadas la naturaleza de la relación de pareja y las necesidades que presenta la víctima, los estatutos generales no amparan al bien jurídico protegido por la Ley 54.[93]

Cuando hay maltrato entre pareja, por definición, la perjudicada está ligada íntimamente a su agresor y, por consiguiente, se presentan unas consecuencias emocionales y psicológicas particulares que no están presentes cuando hay una pelea entre desconocidos e, incluso, entre amigos.[94] En la violencia entre pareja, la víctima está en una posición especialmente vulnerable.[95] Sufre el riesgo de episodios recurrentes de violencia física, psicológica y sexual.[96]

Más aun, los incidentes de violencia tienden a escalar en frecuencia y severidad a través del tiempo.[97] La víctima

---

[93] *Véase* Memorial Explicativo, *supra*, pág. 6.

[94] Véase a Castelló Nicás, *supra,* en que la profesora titular de Derecho Penal de la Universidad de Granada distingue la violencia entre sujetos que sostienen o sostuvieron una relación íntima y la violencia entre unos compañeros de residencia o de servicio militar.

[95] *Id.*

[96] Memorial Explicativo, *supra*, pág. 10.  La Asamblea Legislativa reconoció la importancia de que las agencias encargadas provean protección a la víctima de violencia de pareja "que por su naturaleza está mucho más expuesta a sufrir represalias por parte del ofensor que la víctima de conducta delictiva proveniente de un extraño".

[97] La Organización Puertorriqueña de la Mujer Trabajadora lo describió de la siguiente manera en su ponencia durante el proceso de aprobación de la Ley 54: "Una mujer que sufre

puede temer a las amenazas de que, si delata la violencia, ésta pueda agravarse o costarle la vida a ella o a un ser querido.[98]

De otra parte, cuando se acaba la relación de intimidad, también es frecuente la violencia, el acoso y la humillación, porque el agresor no acepta el fin del compromiso o está inconforme con otros efectos de la separación.[99] El ofensor se ve amenazado en su poder de dominación y, por ello, arremete contra quien ve como rebelde y desafiante.

Hay que añadir a este escenario el silencio de la víctima, que en múltiples ocasiones tarda en informar los actos de violencia, así como la indiferencia de las personas externas a la relación, quienes no los notifican a las autoridades porque no quieren involucrarse en problemas "entre marido y mujer" o porque piensan que ese tipo de violencia es "normal".[100]

---

bofetadas y empujones hoy, mañana recibirá una paliza y más tarde una amenaza de muerte. Hoy sufre episodios de maltrato esporádicamente, mañana cada semana, finalmente diariamente o varias veces al día". Ponencia OPMT, *supra*.

[98] Véase Castelló Nicás, *supra*, en que se indica que las mujeres víctimas de violencia doméstica son usualmente amenazadas "con recibir más violencia si toman medidas contra el agresor".

[99] *Id.* Esta relación de ex pareja también se caracteriza por "la imposibilidad e incapacidad de la víctima de defenderse ante el permanente hostigamiento" del agresor. *Id.*

[100] *Id.;* Silva Bonilla, *supra,* pág. 75. Roxana Vásquez describe la resistencia a identificar la violencia doméstica y reconocerse víctima de violencia de la forma siguiente: "un inmenso territorio en donde la violencia se

El silencio de la perjudicada y la tardanza en denunciar a su agresor se debe, muchas veces, a que entre ellos existe una relación sentimental de afecto.[101] En el caso de las mujeres que se ven involucradas en relaciones adulterinas, la vulnerabilidad es aun mayor, porque su silencio no responde solamente al cariño que pueda tenerle a su compañero consensual, sino también al miedo de que su esposo y su comunidad se enteren de su acto de infidelidad, lo que podría conllevar desde la condena y exclusión social hasta episodios de violencia doméstica en su hogar. La mujer adúltera que sufre agresiones por parte de su amante puede ser objeto de amenazas de ser delatada si denuncia la violencia de pareja. Si logra superar esa coacción para escapar de la relación violenta, se enfrenta a la recriminación social. En ese momento, si no se le proveen

---

ha instalado mejor que en ningún otro, donde por eterna, invisible o silenciada, se convierte en lo más temible. Su gravedad reside en la naturalidad con la que se asume, es tal que para muchos ni siquiera existe". R. Vásquez y G. Tamayo, Violencia y legalidad, Lima, Concytec, 1989, pág. 24.

[101] Los sentimientos que se producen cuando se recibe una dosis de violencia de una persona a quien se ama son muy distintos a los que se sienten cuando el agresor es un desconocido. Véanse los Comentarios de la Directora Ejecutiva de la Comisión para los Asuntos de la Mujer, Oficina del Gobernador en torno al Proyecto del Senado 470 para crear la Ley sobre la Intervención con y la Prevención de la Violencia Doméstica, pág. 10. En el primer escenario se puede tener la esperanza de que la relación mejore y ello influye en el comportamiento de la víctima; obviamente, en el segundo esto no es una consideración. La dependencia afectiva dificulta el que una mujer rompa con un ciclo de malos tratos de parte de su pareja. Silva Bonilla, *supra,* págs. 65-75.

medidas de protección adecuadas, se le expone a un doble peligro: la reprimenda por haber sido infiel y la venganza de su amante por denunciar el maltrato.

En distintos tipos de relaciones, factores como la dependencia económica también pueden provocar que la víctima no delate a quien la maltrata.[102] Las investigaciones sociológicas sobre el problema revelan que muchas veces la víctima duda separarse del agresor, no porque sea masoquista, sino porque tiene miedo de no poder alimentarse ni proveerle a los suyos los bienes necesarios para su subsistencia.[103] Esto va unido al temor de que el sistema de justicia no pueda socorrerla y que su denuncia sólo sirva para recrudecer el maltrato.[104]

Por éstas y otras razones, los científicos han identificado la naturaleza cíclica de la violencia en la relación de pareja.[105] Las tres etapas de este patrón de dominación son claras y perceptibles.[106] La primera es la

---

[102] Castelló Nicás, *supra.*

[103] *Véase* Informe sobre Discrimen en Tribunales, *supra*, pág. 323. El miedo a la miseria económica es uno de los factores que contribuyen, como expresa la profesora Silvia Bonilla, a "encadenar a… [la] mujer a su presente estado de vulneración personal". Silva Bonilla, *supra,* págs. 59-60.

[104] *Véanse* Memorial Explicativo, *supra*, pág. 10; Silva Bonilla, *supra,* pág. 60.

[105] Los científicos asemejan las prácticas de la violencia de pareja a la táctica conocida como lavado de cerebro. Es decir, se somete a la víctima a "períodos sucesivos de maltrato y de recompensas con el propósito de dominar su voluntad". Informe sobre Discrimen en Tribunales, *supra*, pág. 324.

[106] Ganzenmüller, *supra*, pág. 49.

etapa de tensión, en la cual se pueden observar maltratos menores tanto a la víctima como a objetos, sujetos o animales que ella quiere y valora. En la segunda etapa, que es la de agresión, ocurren las peores golpizas o ataques emocionales. La tercera y última es la etapa de reconciliación, en la cual el agresor se torna amoroso y muestra arrepentimiento. Entonces, la víctima perdona a su compañero y confía en que todo va a cambiar, solamente para comenzar el ciclo de nuevo, cuando el maltratante sienta la necesidad de hacer patente su dominio sobre ella.

Es a raíz de estas consideraciones, que particularizan la violencia en el ámbito de una relación de pareja y la distinguen de otras instancias de violencia, que se decidió tipificar este tipo de violencia en una ley especial, separada del delito de agresión del Código Penal.

## C.  El delito de maltrato de pareja tipificado en el artículo 3.1 de la Ley 54

El delito de maltrato tipificado en el artículo 3.1 de la Ley 54 es más específico respecto a la conducta prohibida que el delito de agresión tipificado en el Código Penal. El mismo dispone como sigue:

> Toda persona que empleare fuerza física o violencia psicológica, intimidación o persecución en la persona de su cónyuge, ex cónyuge o la persona con quien cohabita o haya cohabitado, o la persona con quien sostuviere o haya sostenido una relación consensual, o la persona con quien haya procreado un hijo o hija, para causarle daño físico a su persona, a los bienes apreciados por ésta, excepto aquellos que pertenecen privativamente al ofensor, o a la persona de otro

o para causarle grave daño emocional, incurrirá en delito grave de cuarto grado en su mitad superior.
El tribunal podrá imponer pena de restitución, además de la pena de reclusión establecida.[107]

En primer lugar, a diferencia del delito de agresión, el artículo citado equipara la violencia física a la psicológica, como también a la intimidación o persecución.[108] Reconoce así que el maltrato de pareja es producto de un proceso recurrente y escalonado en la severidad de la agresión.[109] Es decir, que las agresiones psicológicas son comúnmente el preámbulo de una agresión física o hasta de un homicidio. Por otro lado, además de reconocer la violencia física, que es la forma de maltrato de pareja más visible,[110] atiende la gravedad de los abusos emocionales en las relaciones de pareja, que, según se ha documentado, se "parecen mucho a las torturas que sufren los rehenes, que también están privados de toda libertad e

---

[107] 8 L.P.R.A. sec. 631.

[108] La Dra. Catherine Kirkwood, para definir abuso emocional, cita a Ginny Ni Carthy en la segunda edición de su libro Getting Free: You Can End Abuse and Take Back Your Life, que dispuso que este tipo de abuso se considera tal cuando los insultos ocasionales alcanzan un "nivel de campaña [que] reduce la autoestima de la esposa y de recurso para mantener el control". C. Kirkwood, Cómo separarse de su pareja abusadora: Desde las heridas de la supervivencia a la sabiduría para el cambio, Barcelona, Granica, 1999, págs. 69-70.

[109] Kirkwood explica cómo las mujeres que ella estudió indicaron que, con el tiempo, los ataques de su pareja "se tornaban más prolongados y crueles". *Id.*, pág. 67.

[110] Silva Bonilla, *supra*, pág. 57.

incluso del sueño, sin saber cuándo les caerá encima el próximo golpe".[111]

En segundo término, el artículo 3.1 de la Ley 54 identifica como sujeto pasivo del delito de maltrato, no sólo al cónyuge y al ex cónyuge, sino también a las personas que cohabitan o han cohabitado con el agresor, las que sostienen o han sostenido una relación consensual íntima con éste y las personas con quienes éste tiene hijos o hijas en común.[112] Es importante señalar que la definición de relación de pareja, recogida en el artículo 1.3 de la Ley 54, identifica a esos mismos sujetos.[113] Cada una de estas categorías debe tener una definición propia, porque, de lo contrario, no tendría sentido enumerarlas como conceptos separados. Las figuras del cónyuge y el ex cónyuge se refieren lógicamente a la institución del matrimonio. La persona con quien se ha procreado un hijo está identificada con la paternidad y la maternidad. El concepto cohabitar, de otra parte, está definido por la

---

[111] A. Mullender, La violencia doméstica: una nueva visión de un viejo problema, Barcelona, Paidós, 2000, pág. 49, citando a D.L.R. Graham y otros, *Survivors of Terror: Battered Women, Hostages and the Stockholm Syndrome* en K. Yllo y M. Bograd, Feminist Perspectives on Wife Abuse, Newbury Park, Sage, 1988.

[112] *Id.*

[113] Véanse el artículo 1.3(m) de la Ley 54, 8 L.P.R.A. sec. 602(m), y el artículo 3.1 de la Ley 54, 8 L.P.R.A. sec. 631.

propia ley e implica "sostener una relación similar a la de los cónyuges".[114]

Entonces, hay que concluir que, para tener un campo de acción independiente, el término relación consensual se tiene que referir a una relación que no sea similar a la de los cónyuges. Para propósitos de la Ley, existe una relación consensual cuando hay un trato de carácter amoroso entre dos o más personas aceptado voluntariamente por éstas, es decir, consentido, sin que necesariamente habiten o hayan habitado juntos, ni se hayan casado o procreado hijos en común.[115] No podemos concebir, como sugiere la Opinión de Conformidad, que el término relación consensual se refiera únicamente a novios que no viven juntos, que pueden tener hijos en común y casarse eventualmente, porque de esa forma la definición se acerca más a la de una familia.[116] No puede dejar de preocuparnos el que los fundamentos filosóficos de este análisis se asemejen tanto a los que justificaron en su momento el sistema de clasificaciones de los hijos como legítimos, ilegítimos o naturales según el estatus matrimonial o "matrimoniable" de los padres, antes de la adopción de la Constitución de Puerto Rico, que decretó la igualdad de las personas y

---

[114] Art. 1.3 de la Ley 54, 8 L.P.R.A. sec. 602.

[115] Véase la definición de consensual, como "perteneciente o relativo al consenso", y la de relación, en el diccionario de la Real Academia Española, http://www.rae.es/rae.html.

[116] Opinión de Conformidad, págs. 17-18.

repudió el discrimen por razón de nacimiento.[117] Por eso, hoy resuenan nuevamente las sabias palabras del juez Hernández Matos en Ocasio v. Díaz: "No podemos perdernos en el laberinto de las injustas distinciones".[118]

Como señalamos anteriormente, la política pública que inspira la Ley 54 no se basa en la protección de la integridad familiar sino en la de la vida y seguridad de todas las personas que son parte de una relación de pareja. Por tanto, la interpretación lógica del término tiene que referirnos a todas las parejas que se encuentran voluntariamente en una relación amorosa y que no pueden ubicarse dentro de las demás categorías por no estar casados o divorciados, no tener hijos en común o no haber residido juntos. Si la propia Ley define "cohabitar" como "sostener una relación consensual similar a la de los cónyuges", no puede definirse "relación consensual" de la misma forma, como una relación que suele convertirse en matrimonio. De ser así, no hubiese sido necesario crear una categoría separada.

Bien advierte la Opinión de Conformidad que aclarar el alcance de una disposición estatutaria "no significa que podemos darle a una ley un significado más limitado al que

---

[117] Art. II, Sec. 1, Const. P.R. Véanse los artículos 111 a 129 del Código Civil, 31 L.P.R.A. secs. 441-508.

[118] Ocasio v. Díaz, 88 D.P.R. 676, 728 (1963). En este caso establecimos que un hijo es simplemente un hijo y sus progenitores su padre o madre, independientemente de las circunstancias del nacimiento y el estado civil de los padres.

usualmente tiene dentro de la realidad social".[119] No podemos ocultar que las relaciones consensuales extramaritales, independientemente de lo que pensemos sobre éstas, son parte de nuestra realidad cotidiana y una porción considerable de nuestra población es producto de las mismas.[120]

El término "relación consensual" no estaba incluido en los proyectos de ley que precedieron a la versión que finalmente prevaleció, sino que fue añadido al proyecto sustitutivo luego de que se celebraran vistas públicas y antes de la aprobación final del estatuto. Así, el que se añadiera el concepto de "relación consensual" denota la clara intención de los legisladores de extender el ámbito de la Ley para proteger a todas aquellas víctimas que, sin tener una relación similar a la de los cónyuges, son especialmente vulnerables a sufrir ciclos de violencia de parte de su compañero o compañera.

Finalmente, el tercer elemento del delito de maltrato es que la agresión esté dirigida a causarle grave daño físico o emocional a la víctima, a sus bienes o a otra persona. En este punto debemos resaltar que, en Pueblo v.

---

[119] Opinión de Conformidad, pág. 8.

[120] Según señaló el profesor Miguel Velázquez hace ya 15 años, "desde hace aproximadamente medio siglo, el propio Tribunal Supremo comenzó a elaborar las normas jurisprudenciales que culminaron en el reconocimiento del hecho de que no se considerara contrario a la política pública el reconocer que existen y son inevitables las uniones extramatrimoniales". M. Velázquez Rivera, Derecho de Familia, 64 Rev. Jur. UPR 799, 807 (1995).

Figueroa Santana, este Tribunal resolvió que no se requiere probar, como elemento del delito de maltrato bajo esta sección, que la persona acusada ha incurrido en un patrón constante de fuerza física en contra de la víctima.[121]

**D. Otros mecanismos o remedios provistos en la Ley 54 para proteger a las víctimas de maltrato de pareja**

Con el propósito de atender la situación de violencia de pareja de manera integral, la Ley 54 también adoptó otros mecanismos o remedios para proteger a las víctimas. Estas herramientas no necesariamente están disponibles para los perjudicados de otros tipos de delitos.

Entre estos mecanismos está el remedio civil de la orden de protección, establecido en el artículo 2.1 de la Ley 54 en los siguientes términos: "Cualquier persona que haya sido víctima de violencia doméstica… en el contexto de una relación de pareja, podrá… solicitar una orden de protección".[122] Se trata de un instrumento que tiene la víctima de la violencia de pareja para alejar a su agresor y organizar otros asuntos relacionados, como la custodia de menores y las relaciones paterno filiales.[123]

Este tipo de orden de protección fue concebida para atender las características particulares de la violencia de pareja y por ello se distingue de la orden de protección contra el acecho provista en nuestro ordenamiento. Ésta se

---

[121] Pueblo v. Figueroa Santana, *supra*.

[122] 8 L.P.R.A. sec. 621.

[123] *Id.*

concede cuando hay un patrón de conducta repetida o constante de vigilancia, proximidad física o visual, amenazas, vandalismo u hostigamiento contra una persona.[124] Como podemos notar, para obtener una orden de protección contra el acecho se requiere un patrón de conducta repetida o constante, mientras que para que se conceda una orden de protección contra la violencia de pareja es suficiente probar un incidente de agresión física o emocional. Con toda probabilidad, los legisladores actuaron conscientes de que, en la violencia de pareja, la integridad física de la víctima, e incluso su vida, puede estar en peligro si se espera hasta el próximo incidente.

Otra de las medidas protectoras adoptadas en la Ley 54 obliga al oficial del orden público a tomar todos los pasos necesarios para prevenir que el abuso se repita. Entre otros, puede arrestar al imputado, aun sin orden judicial, cuando tenga fundamentos para creer que se ha violado la Ley 54, aunque el crimen no haya ocurrido en su presencia y sin importar si el delito es grave o menos grave.[125] Distinto a esto, la Regla 11 de Procedimiento Criminal, que aplica en todos los demás casos, requiere que en caso de delito menos grave el policía haya presenciado el comportamiento ilegal u obtenido una orden judicial antes

---

[124] Ley contra el Acecho en Puerto Rico, Ley Núm. 284 de 21 de agosto de 1999, 33 L.P.R.A. sec. 4013-4026.

[125] 8 L.P.R.A. sec. 638.

de arrestar al sospechoso.[126] Dado el peligro en que generalmente se encuentra la víctima de violencia doméstica, a diferencia del perjudicado de un delito aislado de agresión, el que el agente del orden público pueda intervenir con el denunciado inmediatamente evita que se desencadene mayor violencia o que se susciten consecuencias fatales.[127] Claramente, la Legislatura entendió que el arresto de la persona que maltrata, tan pronto se manifiesta la violencia, es la medida más eficaz para proteger a la víctima y disuadir al agresor.[128]

Por último, el policía que atiende una denuncia de violencia entre una pareja debe informar a la denunciante sobre los servicios sociales disponibles y, si ésta expresa preocupación por su seguridad, transportarla a un lugar seguro.[129] También se requiere que los oficiales del orden público llenen un informe escrito sobre todos los incidentes de violencia entre pareja, independientemente de que no se presenten cargos.[130] No hay tal requisito en otros casos en los que se denuncien hechos presuntamente ilegales. Todas estas protecciones para la víctima de violencia doméstica evidencian que la Asamblea Legislativa

---

[126] 34 L.P.R.A. Ap. II, R.11.

[127] Informe Conjunto, *supra*, pág. 2293.

[128] *Véase* Memorial Explicativo, *supra*, págs. 12-13.

[129] 8 L.P.R.A. sec. 640.

[130] 8 L.P.R.A. sec. 641.

reconoció el carácter particular de este delito y por ello lo tipificó en una ley distinta al Código Penal.

**E. Procedimiento de desvío**

Es significativo que cuando único se hace referencia a la relación de tipo adúltera en todo este andamiaje normativo de rechazo a la violencia de pareja es en la porción de la Ley dedicada a establecer y regular el procedimiento de desvío. Este procedimiento, que tan solo se da luego de una convicción, permite que el convicto de violencia de pareja se someta a un régimen de libertad a prueba, sujeto a su participación en un programa de reeducación y readiestramiento para personas que incurren en conducta agresiva en la relación de pareja.[131]

El artículo 3.6 de la Ley 54 otorga al juez de instancia discreción para "suspender todo procedimiento y someter a la persona convicta a libertad a prueba", en situaciones específicas.[132] Entre éstas, cuando la persona haya sido convicta por el delito de agresión sexual, bajo el artículo 3.5 de la Ley 54,[133] "el desvío del

---

[131] 8 L.P.R.A. sec. 636. El propósito de este mecanismo de rehabilitación, además de los punitivos incorporados en la Ley 54, es "detener la espiral de la violencia doméstica" al cambiar el patrón de conducta y la visión sobre las relaciones humanas. Exposición de Motivos de la Ley Núm. 91 de 26 de agosto de 2005, que enmendó el artículo 3.6 de la Ley 54 para condicionar la participación del acusado en los programas de desvío a que éste acepte la comisión del delito imputado y reconozca su conducta.

[132] *Id.*

[133] 8 L.P.R.A. sec. 635. El delito de agresión sexual conyugal tipificado en la Ley 54 fue innovador cuando ésta

procedimiento sólo estará disponible para los casos en que el acusado sea el cónyuge o cohabite con la víctima al momento de la agresión sexual, siempre y cuando dicha cohabitación no sea adúltera".[134]

La única referencia a las relaciones adúlteras en toda la Ley 54 se da, pues, en el contexto de la concesión de un beneficio al agresor que es convicto. Evidentemente, el legislador reconoció que la violencia de pareja penalizada por la Ley podía suceder en una relación adulterina, pero no quiso beneficiar con el privilegio de desvío a un agresor convicto que sostuvo con la víctima una relación de ese tipo.

Si las disposiciones de la Ley 54 no aplicaran a las relaciones adulterinas, como concluye la Opinión de Conformidad, no sería necesario especificar que no puede otorgarse el beneficio del procedimiento de desvío al adúltero convicto. De esta intención de no favorecer a un acusado que es convicto no podemos extrapolar una intención de perjudicar a su víctima negándole la protección de la Ley 54. En otras palabras, el que se niegue un beneficio al victimario no puede conllevar negarle derechos a su

---

se aprobó en 1989. Esto porque el Código Penal vigente disponía que el delito de violación no se cometía contra la mujer "propia", es decir, contra la esposa. Por lo tanto, la Ley de Violencia Doméstica incorporó este elemento del delito. Sin embargo, en el Nuevo Código Penal de 2004 se incluyó el delito de agresión sexual que puede cometerse también contra la esposa, e incluso, el esposo.

[134] 8 L.P.R.A. sec. 636.

víctima. De otro lado, no escapa nuestro análisis el que la decisión de excluir a las parejas adúlteras del alcance de la Ley realmente favorece al victimario que maltrata a su pareja,[135] sobre quien se tiende, por efecto de la determinación que se está confirmando, un manto de impunidad.[136]

No se trata, como aduce la Opinión de Conformidad, de crear elementos del delito por analogía, en contravención al principio de legalidad. Más bien, como hemos explicado, del texto de la Ley se desprende que el estatuto aplica a las relaciones consensuales en las que se pueda dar la violencia de pareja, y éstas incluyen las relaciones adúlteras. No estamos proponiendo cambiar la definición de pareja de la Ley para incluir relaciones que no están protegidas.[137] _Es la propia Ley 54 la que contiene las relaciones consensuales presentes y pasadas en su enumeración, sin referencia al estado matrimonial de las partes_.

III

Tras evaluar la conducta típica prohibida por el delito de maltrato y las demás disposiciones de la Ley 54,

---

[135] Incurre en el delito de adulterio tanto la persona casada que tiene relaciones sexuales con una persona distinta a su cónyuge como la persona soltera con quien tiene las relaciones. Art. 130 del Código Penal, 33 L.P.R.A. sec. 4758.

[136] Según hemos explicado, la denuncia por el delito de agresión no subsana esta situación.

[137] _Véase_ Opinión de Conformidad, págs. 22-28.

concluimos que el bien jurídico protegido por el delito de maltrato es la integridad física y psíquica de la víctima. Según demuestra el historial legislativo y la declaración de política pública de este estatuto especial, su propósito principal es proteger a la víctima de ese tipo de agresión; específicamente, "preservar su integridad física y emocional, procurar su seguridad y salvar su vida".[138] La razón para ello, como hemos expresado, es que las leyes penales tradicionales no protegían adecuadamente a la víctima de maltrato de pareja, que es más vulnerable a la reincidencia de la violencia, al aumento escalonado en severidad y a unas consecuencias psíquicas y sociales más brutales que las que sufre el perjudicado o perjudicada por la agresión según tipificada en el Código Penal.[139]

---

[138] Art. 1.2 de la Ley 54, 8 L.P.R.A. sec. 601.

[139] Basta fijarse en los otros mecanismos que incorpora la Ley 54 para darse cuenta de que la integridad física y psíquica de las víctimas es el bien jurídico protegido por el estatuto. Entre estas herramientas, la orden de protección inmediata evita la reincidencia al prohibirle al agresor acercarse a la víctima. Además, el que el oficial del orden público pueda arrestar al agresor sin tener una orden del tribunal, cuando tenga fundamentos para creer que se infringió la Ley 54, contribuye a evitar que en ese intervalo de tiempo se cobre la vida de la víctima. Por eso también, el policía tiene la obligación de orientar al denunciante sobre los servicios sociales disponibles, e incluso, transportarle a un lugar seguro cuando exista una amenaza a su seguridad. Todos estos mecanismos demuestran que el legislador estaba preocupado por proteger la vida e integridad física y emocional de la víctima que es vulnerable a los ataques de su pareja. Son herramientas que se han juzgado necesarias para proteger a la víctima del maltrato de pareja y atender las características especiales de ese delito. Por eso, no están disponibles para otros tipos de delitos.

Sin duda, el legislador tomó en consideración que el maltrato en el seno de una pareja, o entre quienes fueron una pareja, es más difícil de identificar e incluso de probar en un tribunal, muchas veces por la resistencia que tienen sus víctimas a reconocer las implicaciones y el carácter delictivo de este tipo de violencia y por nuestra cultura que, aún en nuestros tiempos, la remite al ámbito de lo privado.[140]

Abona a nuestra conclusión la claridad con la que la Ley 54 establece que aplica a personas que sostienen o han sostenido una relación consensual, independientemente de su estatus civil. Esta ley no se limita a prohibir el maltrato conyugal, como lo hicieron algunos de los proyectos que le antecedieron.[141] Por el contrario, el estatuto es expresamente aplicable a víctimas y agresores que tienen una relación íntima consensual o de convivencia. También cobija a aquellos cuya única relación fue tener un hijo en común. La diversidad de situaciones a las que aplica la Ley refuerza nuestra apreciación de que, más que promover o

---

[140] Ganzenmüller, *supra*, pág. 15. Estos autores se refieren al caso común en que una mujer, luego de presentar una denuncia de violencia de pareja, quiere retirarla, lo que hace difícil presentar una acusación contra el agresor. Concretamente, relatan que "[l]a mujer suele comparecer a los pocos días en el juzgado para indicar que ya se ha reconciliado con su pareja y no desea intervenir en el procedimiento, modificando sustancialmente su declaración de forma que las contradicciones sean evidentes". *Id.*

[141] Véanse el Proyecto del Senado 90 de 1989, el Proyecto del Senado 470 de 1989 y el Proyecto de la Cámara 615 del mismo año.

proteger un tipo de relación particular, la Ley 54 protege la integridad de la víctima que se encuentra en un particular estado de indefensión y susceptibilidad. Una mujer adúltera sufre lo mismo que el resto de las mujeres que son víctimas de violencia por parte de sus parejas. Profesionales de la conducta humana explican que "este ambiente de terror y de miedo lo pueden experimentar independientemente de si su matrimonio es legalmente validado o de si es consensual, o si es la amante de un hombre específico".[142]

Si entendiéramos, como lo hizo el tribunal intermedio apelativo y lo hacen los miembros de este Tribunal que suscriben la Opinión de Conformidad, que la Ley 54 no aplica a los miembros de una pareja consensual adúltera porque el adulterio es ilegal, tendríamos que concluir que ese estatuto tampoco protege a la víctima de una agresión a manos de la persona con quien tuvo un hijo si el hijo fue fruto de una relación adúltera. Tampoco protegería a quien

---

[142] Silva Bonilla, *supra,* pág. 58. Estas investigadoras se refieren a una narración hecha por una trabajadora social sobre la fuerte presencia de la violencia física en las relaciones entre amantes. La orientadora relató:

Nosotras nos enteramos de muchos casos de mujeres a quienes sus amantes las maltratan. Esas mujeres no se atreven a pedirnos orientación y ayuda porque creen que nosotras las vamos a perjudicar por vivir con esas personas en violación a los reglamentos de estos tipos de residenciales (viviendas subsidiadas). Pero nosotras nos enteramos de todos modos porque los golpes son visibles y porque las demás residentes de los edificios lo comentan.

Véase a estas mismas autoras a la pág. 97.

haya convivido o conviva con su agresor si uno de ellos está casado legalmente con otra persona, ni a quien hubiera puesto fin a una relación adúltera y fuera atacada por esa ex pareja consensual. Resulta irrazonable que la Ley exponga claramente que aplica a quienes cohabitan y este Tribunal exceptúe a quienes conviven con un amante; que la Ley disponga que aplica a quienes han procreado hijos en común y este Tribunal exceptúe a quienes tuvieron ese hijo con una persona casada; que la Ley establezca indiscutiblemente que aplica a personas que hayan tenido o mantengan una relación consensual y este Tribunal exceptúe a quienes incurren en adulterio en esa relación consensual. Se trata, pues, de una interpretación contraria a la intención legislativa que no encuentra apoyo en el texto de la Ley ni en su historial.

La Opinión de Conformidad argumenta que la intención legislativa al incluir la frase "relación consensual" no fue abarcar uniones como las adulterinas. Se basa en que, en el contexto penal, la Asamblea Legislativa ha decidido mantener el adulterio como un delito, a pesar de haber tenido oportunidades para seguir la tendencia moderna de suprimirlo. Su lógica enuncia que no es posible que la misma Asamblea Legislativa que busca combatir el adulterio por entender que es un mal social proteja la integridad física y emocional de alguien que ha participado en una

relación adúltera.[143] <u>El problema de ese razonamiento es que parte de la premisa errada de que se está tratando de proteger, y con ello condonar, una ilegalidad, cuando lo que se está intentando proteger es el bien jurídico de mayor jerarquía, la vida.</u>[144]

Además, el propósito del Estado al enjuiciar al agresor bajo la Ley 54 es prevenir el crimen y proteger a las víctimas, no juzgarlas por otro comportamiento del cual no han sido acusadas. El enfoque moderno en el campo penal no favorece que se realicen juicios valorativos sobre la moralidad de las víctimas.[145]

Es absurdo pensar que no se pueda cometer un crimen sobre una persona porque ésta posiblemente cometió otro delito. Es igualmente absurdo pensar que una persona pierde el derecho a todos los remedios y las protecciones que le otorgan las leyes sólo porque posiblemente participó en un

---

[143] *Véase* Opinión de Conformidad, págs. 22-23.

[144] Encontramos un ejemplo de cómo las leyes ignoran una violación a un bien jurídico de menor importancia para proteger uno de mayor importancia en la ley federal Violence Against Women Act (VAWA), 42 U.S.C. secs. 13931-14040 (1994), que dispone excepciones a las leyes de inmigración para que las mujeres que se encuentran residiendo ilegalmente en Estados Unidos y sufren de violencia doméstica por parte de sus esposos o ex esposos ciudadanos norteamericanos puedan recibir sus documentos de residencia. De esta forma, se le da más peso a la vida y la seguridad de la inmigrante que a su estatus migratorio ilegal.

[145] Véanse, por ejemplo, las Reglas 412 y 413 de Evidencia de Puerto Rico de 2009, sobre la inadmisibilidad de evidencia sobre conducta sexual de las víctimas de agresión sexual y hostigamiento sexual. 32 L.P.R.A. Ap. VI, R. 412-413.

acto que está sancionado por alguna ley. Desproteger a una víctima de violencia de pareja porque ha sido infiel se asienta en ese absurdo.

Es evidente que la interpretación que propone la Opinión de Conformidad dejaría desprotegidas a cientos o miles de mujeres que, si bien son adúlteras, son tan susceptibles o vulnerables como una esposa o una novia a la agresión física o psíquica del maltrato de pareja. Nuestra labor como foro de justicia no es emitir opiniones en el abstracto. Tenemos que analizar y reconocer las consecuencias de nuestras decisiones.

En este contexto, es meritorio resaltar que, en los últimos 10 años, más de 250 mujeres han sido asesinadas por sus compañeros consensuales o sus ex parejas en Puerto Rico y que nuestro país ocupa el puesto número 12 respecto a asesinatos por violencia de pareja per cápita y el número 5 en prevalencia del problema de violencia machista entre las naciones del mundo.[146] Las estadísticas de la Policía de Puerto Rico reflejan que cada año se reportan entre 17,000 y 23,000 incidentes de violencia doméstica. En el 2008, murieron 26 mujeres en sucesos de violencia machista; en el 2009, murieron 16, y en el 2010, murieron 19.[147] Cualquier

---

[146] *Véase* Instituto Centro Reina Sofía, III Informe internacional: Violencia contra la mujer en las relaciones de pareja, España, 2006, disponible en http://www.malostratos.org/images/pdf/010%20informe%20reina%20sofia.pdf.

[147] Véanse las estadísticas sobre violencia doméstica recopiladas por la Policía de Puerto Rico y por el proyecto

persona atenta a la realidad que nos rodea sabe que, en tan sólo los primeros tres meses de este año, 10 mujeres han sido asesinadas por sus parejas o ex parejas.[148] Ante esta triste e indignante situación, la decisión de limitar la aplicación de las pocas herramientas legales con que cuentan las víctimas para proteger su integridad y sus vidas es profundamente decepcionante.

IV

La Ley 54 no requiere de la víctima una cualidad especial, como lo sería la fidelidad. Tampoco impone una cualidad especial a la relación, como lo sería la legalidad.[149] Por el contrario, el legislador quiso incluir

---

TendenciasPR adscrito a la Universidad de Puerto Rico en http://www.pr.gov/PoliciaPR/Estadisticas/ViolenciaDomestica.htm y http://www.tendenciaspr.com/Violencia/Violencia.html.

[148] Véase el recuadro sobre las víctimas fatales de violencia de género en el 2011, como parte del reportaje especial de portada *Imparable violencia de género* de la serie *Basta ya*, en Primera Hora, 17 de marzo de 2011, pág. 4. Véanse también Miguel Rivera Puig, *Mata esposa y se suicida*, El Vocero, 17 de marzo de 2011, pág. 10, y Javier Colón Dávila, *Comerciante mata a su esposa y se suicida*, El Nuevo Día, 17 de marzo de 2011, http://www.elnuevodia.com/despiadadoasesinato-916623.html. De los 10 asesinatos de mujeres a manos de sus parejas o ex parejas consensuales ocurridos desde enero de este año, 7 han sido certificados por la Policía como asesinatos por violencia doméstica; los otros 3 se encuentran en investigación para clasificación estadística.

[149] En este sentido, debemos aclarar que la Ley 54 no está diseñada para proteger las uniones sentimentales y legales de hombres con mujeres. La Opinión de Conformidad cita este falso propósito, enfatizando en un supuesto requisito de legalidad de la relación que no contiene la Ley, sino que fue mencionado en Pueblo v. Ruiz, *supra*, para darle mayor fuerza a la Opinión mayoritaria de ese caso, con el fin de impedir que la Ley 54 aplicara a parejas homosexuales. No se puede sacar esa expresión de su contexto para exigir que las relaciones heterosexuales sean "legales" como requisito

las relaciones consensuales dentro del ámbito protegido por

el estatuto especial, porque reconoció que se trata de una

realidad social moderna en la cual se pueden suscitar los

incidentes de violencia que la Ley 54 pretendió atender.[150]

---

para brindar protección al miembro de la pareja que sufre actos de violencia. *Véase* Opinión de Conformidad, págs. 16 y 24.

[150] A modo ilustrativo, exponemos a continuación algunos de los casos sobre violencia doméstica al interior de relaciones adúlteras que han llegado a nuestro Tribunal de Apelaciones en años recientes. En Pueblo v. Chico Rivera, KLCE20050361 (Panel integrado por la jueza López Vilanova y los jueces Córdova Arone y Escribano Medina, quien disintió; 30 de junio de 2005), la perjudicada era una mujer casada a quien su amante amenazó con hacerle daño si no volvía con él luego de que ella le anunciara su intención de terminar la relación adúltera. El Tribunal falló en contra del acusado, quien alegaba que no le aplicaba la Ley 54 por la relación ser adulterina, y subrayó que el alcance de dicha ley no puede limitarse a las relaciones socialmente aceptadas, porque la misma no fue creada para otorgar legitimidad a cierto tipo de parejas, sino para proteger de violencia a todos los involucrados en relaciones íntimas. Asimismo, en Pueblo v. Vélez González, KLAN0601657 (Panel integrado por los jueces Rodríguez Muñiz, Soler Aquino y Cordero Vázquez; 25 de febrero de 2008), los jueces señalaron que el planteamiento del acusado de que no le aplicaba la Ley 54 porque su pareja era una mujer casada carecía de todo mérito, ya que quedó probado que mantuvo una relación amorosa con la perjudicada durante 11 meses, lo que responde a una relación consensual sin cohabitación protegida por la Ley. El acusado llevó a cabo un patrón de persecución, intimidación y violencia contra su amante casada, que incluyó romperle sus pertenencias, decirle que mataría a sus hijos, amenazarla con un arma blanca, echarle gas pimienta, golpearla y treparse en el bonete de su auto cuando intentó huir. *Véanse* también Pueblo v. Valentín, KLAN200901279 (Panel integrado por los jueces Aponte Hernández y Cabán García y la jueza Cintrón Cintrón; 30 de junio de 2010) y Pueblo v. Flores Rodríguez, KLCE200900073 (Panel integrado por los jueces Feliciano, Hernández Serrano y Rosario Villanueva; 10 de julio de 2009). Este último, en alusión a lo comunes que son estos tipos de casos, comienza señalando: "Nuevamente regresa a este Tribunal de Apelaciones la controversia de si a una relación consensual adúltera, dentro de la que surge un

Es importante enfatizar que este estatuto protege a la persona que sufre la violencia, no a la relación constituida con su agresor.[151]

No proteger a una víctima de violencia doméstica porque está o estuvo involucrada en una relación adúltera implicaría castigarla doblemente. Recibiría así el castigo de ser víctima de su agresor y el castigo de la indiferencia del Estado.[152] No podemos pasar por alto que esa indiferencia a la destrucción de la integridad física y psíquica de un ser humano es contraria a nuestros principios constitucionales. La Carta de Derechos de la Constitución de Puerto Rico consagra que "la dignidad del ser humano es inviolable", lo cual incluye el derecho a la vida que también está reconocido expresamente.[153] La palabra

---

incidente de violencia o maltrato entre sus componentes, le son de aplicación las disposiciones de la Ley Núm. 54 de 15 de agosto de 1989".

[151] Vicente, *supra*, págs. 580-581. Precisamente, el que se extendiera su alcance para cubrir a las personas que están en relaciones fuera del matrimonio legal, incluso en relaciones de pareja ilegales, fue un paso importante en el proceso de reconocer que en Puerto Rico las relaciones afectivas familiares y sexuales están formadas en múltiples estructuras y no limitadas a la unidad familiar tradicional. *Id.*

[152] El Jefe de Fiscales de Girona, Carlos Ganzenmüler Roig, lo llama violencia complementaria. Ganzenmüller, *supra*, pág. 47.

[153] *Véanse* Art. II, Sec. 1, Const. P.R., L.P.R.A., Tomo 1, 2008, pág. 272; Art. II, Sec. 7, Const. P.R., L.P.R.A., Tomo 1, 2008, pág. 296; 2 Diario de Sesiones 1371-1372 (1961). El señor Benítez, uno de los constituyentes, expresó que "el principio de que el ser humano y su dignidad constituyen la razón de ser y la justificación de

"vida" se incorporó en nuestra Constitución para significar tanto el "hecho de continuar uno respirando" como otros derechos que son "necesarios para el debido desenvolvimiento de la personalidad humana".[154] Así, el Estado es el responsable de proteger los derechos constitucionales de las personas y, para ello, debe ser activo y efectivo.

El Tribunal Supremo es uno de los componentes del Estado llamados a cumplir con ese deber de protección. No es un foro para pasar juicio sobre la moralidad de la conducta de los ciudadanos y las ciudadanas. En palabras de la profesora Ivette Ramos Buonomo: "La obligación de los jueces del Tribunal Supremo es definir la libertad de todos, hacer respetar los derechos fundamentales de todos. Ello no incluye imponer su propio código de moralidad".[155]

Y si fuéramos a entrar en consideraciones morales, tendríamos que concluir que lo inmoral sería abandonar a una persona afligida por la violencia de su pareja. No podemos, en un afán de promover una visión de lo que consideramos que debe ser el comportamiento adecuado, negarle protección a una persona que ve en peligro su seguridad y su vida. No debemos enclaustrarnos en

la organización política". 2 Diario de Sesiones 1372 (1961).

[154] 2 Diario de Sesiones 1503-1504 (1961).

[155] Ivette Ramos Buonomo, _Análisis del Término 2004-2004: Tribunal Supremo de Puerto Rico: Derecho de Familia_, 75 Rev. Jur. UPR 293, 319-320 (2006).

categorías absolutas del bien y el mal para condenar todo lo que no se ajuste a nuestra visión de lo que es correcto.[156] El adulterio, independientemente de nuestro criterio moral, no puede ser la razón por la cual le neguemos a una mujer los remedios que la legislación ha dispuesto para ayudarla a salvarse de una pareja que le hace daño. Hacerlo constituiría un atropello a un valor mucho más poderoso en nuestro ordenamiento jurídico y en nuestros cimientos como sociedad: el respeto a la vida humana.

V

El señor Flores Flores aceptó que entre él y la señora Romero Pérez hubo una relación consensual de "novios", que incluyó relaciones sexuales por aproximadamente diez meses. El que la perjudicada estuviera casada con otro hombre al mismo tiempo no afecta el hecho de que mantenía una relación consensual con el recurrido. Conforme con lo aquí explicado, la relación sostenida entre el acusado y la perjudicada está incluida tanto en la definición de "pareja" del artículo 1.3 de la Ley 54, como en el artículo 3.1 del mismo estatuto, que tipifica el delito de maltrato dentro de una "relación consensual". Por lo tanto, lo correcto debió haber sido resolver que la determinación de causa probable se hizo conforme a la ley y al derecho. Esa

---

[156] Para una discusión sobre los valores morales y cómo moldean inconscientemente nuestras acciones, véase George Lakoff, *The Brain's Role in Family Values*, en <u>The Political Mind</u>, New York, Viking, 2009, págs. 75-91.

decisión hubiese sido cónsona con el texto y el espíritu de la Ley para la Prevención e Intervención con la Violencia Doméstica.

La política pública contenida en la Ley 54 expresa que: "Las ideas, actitudes y conductas discriminatorias también permean las instituciones sociales llamadas a resolver y a prevenir el problema de la violencia doméstica y sus consecuencias".[157] El Tribunal Supremo no puede ser una de esas instituciones. Sin embargo, con decisiones como la que algunos miembros de este foro avalan hoy, nuestro sistema de justicia se hace cómplice de la violencia de pareja que tantas vidas está destruyendo en Puerto Rico. Como me niego a ser partícipe en esta injusticia, disiento.

Liana Fiol Matta
Jueza Asociada

---

[157] 8 L.P.R.A. sec. 601.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Pueblo de Puerto Rico                                    Certiorari

  Peticionario

                                  CC-2007-148

    v.

Miguel Flores Flores

    Recurrido


Voto de Inhibición emitido por el Juez Asociado señor Rivera García


En San Juan, Puerto Rico, a 23 de marzo de 2011.

En el recurso de referencia el Juez suscribiente participó directamente en calidad de Juez Superior en el Tribunal de Primera Instancia. En el foro primario se emitió una resolución declarando no ha lugar una solicitud de desestimación presentada bajo el palio de la Regla 64(p) de Procedimiento Criminal, 34 L.P.R.A. Ap. II R. 64(p).

El dictamen emitido en ese entonces, estuvo fundamentado en el criterio de ausencia total de prueba necesario para demostrar que la determinación de causa probable no fue con arreglo a la ley y a derecho. Es decir, solo ante la carencia total de prueba sobre la probabilidad de que estén presentes y probados uno, varios o todos los elementos del delito imputado o la conección del imputado con tal delito, procede decretar la desestimación de la acusación presentada contra el solicitante. *Pueblo v. Rodríguez Ríos*, 136 D.P.R. 685 (1994); *Pueblo v. Rivera Alicea*, 125 D.P.R. 37 (1989). Al evaluar la prueba de cargo y la defensa vertida durante la vista de desestimación colegimos que el acusado incumplió con el referido criterio.

Como es sabido, la Regla 63 de las de Procedimiento Civil, 32 L.P.R.A. Ap. V, al igual que los Cánones de Ética Judicial exigen que el juez no

solamente ha de ser imparcial, sino que su conducta ha de excluir toda posible apariencia de parcialidad. Es por ello, que los criterios de imparcialidad y objetividad que rigen la función judicial son de tal trascendencia que nuestro ordenamiento jurídico exige que en cualquier causa que tienda a minar la confianza pública o razonablemente arrojar dudas sobre la imparcialidad para adjudicar, el juez deberá inhibirse de actuar en el pleito o procedimiento.

A la luz de las circunstancias esbozadas y en consideración a los imperativos éticos, nos inhibimos de entrar a evaluar los méritos del presente caso.


Edgardo Rivera García
Juez Asociado